### Jenkins v. Commonwealth.

(Decided December 17, 1915.)

## Appeal from Warren Circuit Court.

1.  Criminal Law—Motion to Set Aside Indictment—Not Reviewable. —Under the provisions of section 281 of the Criminal Code the action of the trial court upon a motion to set aside an indictment is not the subject of exception, and is not therefore reviewable by this court.

2.  Criminal Law—Joint Indictments—Separate Trials.—At Common Law the Commonwealth, and not the defendant, in case of joint indictments against several for felony, had the right of election to separate the trials of the several defendants, subject to the discretion of the court; and section 237 of the Criminal Code granting this right to defendants, did not abrogate or alter this common law right of the Commonwealth.

3.  Criminal Law—Change of Venue—Trial.—Where there are several defendants jointly charged in the same indictment, and the prosecution as to a part of them is removed upon motion of the Commonwealth to another county and a certified copy of the indictment is sent by the clerk to such other county, the trial therein may be had on such copy.

4.  Criminal Law—Continuance.—A defendant on trial against whom evidence is given which he claims is a surprise to him, is not entitled to a continuance on that ground where the affidavit filed by him in support of his motion does not disclose the name of any witness by whom he could show that the evidence against him was not true, as such affidavit could in no event be read as the deposition of any witness; and particularly when the evidence complained of was of a collateral nature and was admitted only for a special purpose.

5.  Criminal Law—Conspiracy.—In an indictment charging a conspiracy under sub-section 1 of section 1241a, Carroll's 1915 Kentucky Statutes, which also alleges under sub-section 3 of that section, that injury actually resulted to the person by reason of such conspiracy, the maximum punishment is that prescribed by subsection 3.

6.  Criminal Law—Conspiracy.—The fact that the instructions authorized a conviction of appellant on his separate trial if he entered into the conspiracy with others than those named in the

indictment when the indictment only charged that the conspiracy was entered into by those named therein, was not prejudicial to appellant where the evidence was conclusive that the conspiracy was between those named in the indictment, although all of the conspirators may not have been named therein.

7. Criminal Law—Conspiracy.—Under such charge of conspiracy one may be convicted even though he was not present when the same was executed; the language of sub-section 3 contemplates that if any injury shall result to the person as a result of such conspiracy, even though part of the original conspirators may not be present when the conspiracy is carried out, they are guilty.

8. Criminal Law—Conspiracy.—Where the guilt or innocence of a defendant charged with a conspiracy is involved with an organization to which he belongs, and the sole issue on the trial is the identification of defendant as one of the conspirators, and it is shown that this organization of which defendant was a member had been guilty about the same time and in the same locality of similar conspiracies against others and had executed them, upon the issue of identity, evidence that the defendant was present and participated in other similar occurrences about the same time and in the same locality and carried out in practically the same way, was competent to identify him as a member of the organization when accompanied by an admonition from the court that it was admitted only for such purpose.

T. W. & R. C. P. THOMAS, W. A. HELM and W. R. GARDNER for appellant.

JAMES GARNETT, Attorney General; ROBERT T. CALDWELL, Assistant Attorney General, and JOHN H. GILLIAM for appellee.

OPINION OF THE COURT BY JUDGE TURNER—Affirming.

At the February term, 1915, of the Butler circuit court, the following indictment was returned, to-wit:

"The grand jury of the county of Butler in the name and by the authority of the Commonwealth of Kentucky, accuse Silas Gardner, J. A. Gardner, Dock Gardner, Bunk Haws, Marion Drake, Andrew Drake, Ben John Penrod, P. C. Jenkins, J. E. Mayhugh, Harry Grubb, Doss Peay, Joseph Drake and Elzie Pendley of the offense of unlawfully, wilfully and feloniously banding and confederating themselves together for the purpose of intimidating, alarming, disturbing and injuring another and did injure and wound said others, to-wit: Katherine Webster, Louella Webster and Estil Webster and the said defendants herein mentioned, and others whose names are to the grand jury unknown, did go forth in the night time with guns and other weapons for

the purpose of intimidating, alarming, disturbing and injuring and whipping said Katherine, Louella and Estil Webster, and did in the night time as aforesaid, go to the house of James Webster and seize and lay hold of said James, Katherine, Louella and Estil Webster and did take them from their house and from their beds and tied them to a tree and with blind folds over their eyes and ropes around their necks did beat, bruise, stripe, whelp and injure, intimidate and scare said parties, and defendants being armed and having weapons drawn upon said parties at said time.''

At the same term of the court, the Commonwealth's attorney filed his statement, as provided by statute, and entered his motion to change the venue of the action; but, before it was acted upon, withdrew the same except as to P. C. Jenkins and Marion Drake. The court, from evidence heard and personal knowledge, as recited in the order, granted a change of venue upon the ground that there was such a state of lawlessness and such a prevalent bias for and against the charge in the indictment in Butler county that a fair and impartial trial could not be had therein, and the case was, as to Jenkins and Drake, removed to the Warren circuit court for trial. The court directed the clerk to copy the indictment, orders, motions, notices, etc., and to make a complete transcript of the record, and directed that the same be delivered to the clerk of the Warren circuit court, all of which was done.

At the April term of the Warren circuit court the defendants entered a motion to quash the indictment because the names of the grand jurors drawn from the jury wheel in the Butler circuit court, and which had been furnished by the clerk to the sheriff in a list showing the order in which they were drawn, had not been called by the sheriff in the order their names came on the list, but that the sheriff, instead of so calling the jurors' names, in violation of law, selected twelve names out of the said list without regard to their order thereon, and it was done for the purpose of securing a jury that would indict the defendants. This motion was overruled by the court, and the order overruling it shows that the sheriff in calling the names from the list in the manner set out, had acted under the direction of the court.

Appellant, Jenkins, being put on his separate trial, was found guilty and the verdict fixed his punishment

at confinement in the penitentiary for not less than four years nor more than four years and one day. His motion for a new trial having been overruled, he has appealed.

The evidence for the Commonwealth is, that on the 22nd of August, 1914, at Union Chapel, in Butler county, there was a meeting to which numerous men in the neighborhood had been invited, and at which there appeared a man named Clark claiming to be the representative of a secret order known as the Amalgamated Workers of the World, and claiming to be the organizer of local lodges of that order. He made a speech to those present, giving the name of the order, but saying they were sometimes called "Possum Hunters;" that, among other objects of the order, was that its members should stand by and help each other, and if any of them got into court they were to aid each other, and that if any of their members got on the jury when a member was being tried he was to hang the jury or clear him. After this and possibly other speeches, appellant, Jenkins, assuming to act with authority, directed that a line be drawn on the floor and all of those who desired to join were to cross on one side of the line, and that after this division was made those who did not join were directed to "go home and hold their tongues."

That shortly after this organization of the local lodge at Union Chapel, there were certain night raids in various parts of the county at which persons were whipped, beat and bruised by bodies of masked men. On the 27th or 28th of October, at some time during the night, a body of masked men went to the home of James Webster, broke the doors open, seized James Webster, Katherine Webster, his wife, a woman sixty-five years of age, Louella Webster and Estil Webster; they took them about three hundred yards from the house, and after first tying the aged woman to a tree with her arms around the tree and her face towards it, lifted her clothes above her head and with a leather strap whipped her unmercifully on her naked body. They then duplicated this proceeding with the younger woman, Louella Webster, and finally placing a rope around the neck of Estil Webster drew him up and let him down at least twice, and finally compelled him to falsely state to them that two men named Bradley were the persons who had shot into the raiders, and after that proceeded to give

him an unmerciful whipping on his bare body. The masked men had firearms and flash-lights, and not only whipped both of the women, as stated, but put ropes around their necks, cursed them, and otherwise terrorized them. While they did not offer personal violence to the old man, he was taken from the house and forced to witness the fiendish punishment administered to his aged wife, his daughter and his son.

Each of the Websters positively identifies appellant as one of the party, and each of them testified to recognizing at the time different ones who were jointly indicted with Jenkins. They also stated that Jenkins seemed to be the leader of the party and gave all orders; that the members of the party said to the wife of Estil Webster that they were her friends and that she need not be afraid, and gave as a reason for their treatment of the other Websters that they had been guilty of some mistreatment of Estil Webster's wife and warned them thereafter to treat her as a lady.

There is also evidence to the effect that about the time these outrages were being perpetrated in Butler county, Jenkins, in conversation with at least two persons, while denying that he was a member of the organization known as "Possum Hunters," professed to give what he understood to be their mode of procedure in dealing with persons who had for any reason incurred the displeasure of the order. He stated that he was informed that they would summon a jury and witnesses in the order and try the case, and if the parties needed "attending to" they went and attended to them, and if not they let them alone. On the trial of this case, however, Jenkins admitted on the witness stand that he was not only a member of the local chapter of this order but was its president or leader.

Conditions became so bad in the latter part of 1914 that it was generally rumored that an extra session of the grand jury was contemplated for the purpose of investigating these raids, and as the record discloses, a special term of the court was actually called, but later called off. About that time appellant manifested great interest in the proposed special term of court, and, it may be inferred from circumstances in the record, went to the county seat to find out what he could about the same. Knowing the county court clerk, Moats, he went to see him, and in discussing this proposed special term of the

court, among other things, said to Moats, as shown by the latter's testimony:

"He told me that it wouldn't do for it to be called, and said if it was called it might be that 300 or 400 men might come in there and sweep the town off the map, and if the judge and Commonwealth's attorney did come it might make them swim the river backwards home, and he went ahead to tell about the organization; that they had the very best of guns that would shine like electric lights, and was talking about the order; said the Masons and Odd Fellows was nothing to compare with the 'Possum Hunters,' and that the organization was for the good of the community, and before the organization existed he told about how it was around Huntsville; that the boys would stay out in the yard, and after this occurred there was no laughing out in the yard; that even the chickens were afraid to crow; the cows were afraid to low, and the cats were afraid to mew after the sun would go down."

"Q. Anything else? A. He asked me the question, he said: 'Say they got them up and convicted them, what are they going to do with them? The jails won't hold them and the penitentiaries won't hold them; they are about 80% strong over the State.' "

This witness upon being recalled by the Commonwealth and asked if he had omitted in his former testimony anything which Jenkins had said to state it, and he answered

"A. Yes, sir. I remember one thing very distinctly that I omitted. In his conversation referring to the bravery of them he said they didn't no more care for being shot into than a brick wall; that they demonstrated that fact down at Webster's; to be shot into on the road didn't frighten them a bit, that they went right on and got their possum and dressed it up right nice, and went on about their business."

The evidence in the whole case revolves around the organization of this order, the purpose of its organization, and the connection of Jenkins with it, and although the indictment in this case only charges a conspiracy against the Websters, yet an investigation of that charge inevitably involves reference to similar outrages perpetrated in the county about the same time. Under these circumstances the trial court permitted the Commonwealth to prove other similar happenings in the county

prior to and about the time of the whipping of the Websters, and in one instance to prove a whipping which occurred about nine or ten days thereafter, and was permitted to show that upon some of these occasions appellant was present and acting in the capacity of a leader.

It is not denied that the Websters were whipped, and it is admitted that appellant was not only a member of, but the local leader of this organization.

Six grounds for reversal are relied upon, to-wit:

1. That the grand jury was improperly selected, and that appellant's motion to quash the indictment for that reason should have been sustained.

2. That the court erred in granting a change of venue as to a part only of the defendants jointly indicted.

3. That the trial was held and conviction had only on a copy of the indictment.

4. That after the admission of evidence as to other offenses, the court should have sustained appellant's motion to discharge the jury and continue the case.

5. The instructions were erroneous, because they authorized the infliction of a greater penalty than was authorized by law, and (2) because they authorized a conviction if appellant had formed a conspiracy with others than those named in the indictment, (3) and because they authorized a conviction even though appellant was not, in fact, present at the whipping of the Websters.

6. Because the evidence as to raids other than the Webster raid was incompetent.

Upon the first question little need be said as it is expressly provided in sec. 281 of the Criminal Code that the action of the trial judge upon motion to set aside an indictment shall not be subject to exception, and it has often been held by this court that such questions can not be reviewed by it.

Commonwealth v. Gaulet, 140 Ky., 843; Commonwealth v. Simons, 100 Ky., 164.

It is proper, however, to say in this connection, in justice to the trial judge, that he explains in an opinion handed down by him on the motion for a new trial that in directing the sheriff not to call certain persons as grand jurors, he was acting upon information that those persons had been or would be intimidated because of fear of the "possum hunters'" organization, and that some of them had indicated to him that they were afraid to serve as grand jurors.

Whether the Commonwealth may ask for, or the court grant, a change of venue as to a part only of the defendants who are jointly indicted for a felony has not, so far as we are aware, been passed upon in this State. In this case the change of venue was originally asked for by the attorney for the Commonwealth as to all of the defendants, but before the motion was passed upon it was withdrawn as to all of them except appellant and one other; so that when the court acted, there was no motion for a change of venue except as to the two.

From the nature of the question it would seem to depend upon whether or not the Commonwealth, as a matter of right, might have a severance and demand separate trials of the several jointly indicted defendants; for, if this right existed upon the part of the Commonwealth, it could not possibly matter to any of the other defendants whether the change of venue was granted to a specific one. While, on the other hand, if the Commonwealth had no such right and the defendants, as a matter of right, might demand that they all be tried together it was necessarily beyond the power of the court to compel them to be tried separately by transferring the case as to a part of them to another court.

Under section 237 of the Criminal Code, any defendant who may be jointly indicted with another, or others, for a felony is granted a right to a separate trial, but nothing is said in that section about the right of the Commonwealth to a separate trial of such indictments. Under the common law, however, a defendant had no such right and the section of the Criminal Code referred to changed the common law rule in so far as it applied to such defendant, but did not undertake to change or alter the common law right of the Commonwealth in the premises. That is to say, the right of the Commonwealth to a separate trial of persons jointly indicted for a felony must still be controlled by the common law. In the case of Hoffman v. Commonwealth, 134 Ky., 726, this question was fully gone into and it was held that at common law the Commonwealth, in case of joint indictments, had a right of election, subject to the discretion of the court, whether to try persons jointly indicted for a felony separately or jointly, and that the provisions of section 237 of the Criminal Code had not abrogated or altered this right.

The Commonwealth, therefore, having this right of severance, the whole question reverts to the proposition whether the court in changing the venue of appellant's case to Warren county abused its discretion; for, when it removed the case to Warren as to part of the defendants, it necessarily exercised its discretion upon the question whether there should have been a severance, for, of course, if the case was in one court as to part of the defendants and in another court as to another part, there must necessarily be separate trials.

There is no claim in this case that the court abused its discretion in the ordinary sense in removing this case as to appellant to Warren county, and if there had been such contention the facts of the case, already detailed, would be conclusive not only that the court had not abused its discretion, but that he would have been grossly derelict in his duty if he had not done so.

Section 1115, Kentucky Statutes, provides that when there is a change of venue and a prosecution is removed to another county, the clerk of the court shall transmit the original papers, together with a transcript of the orders pertaining thereto, to the clerk of the court to which the removal is ordered, and from this it is argued by appellant that he was entitled to a trial in the Warren circuit court on the original indictment and not on a copy of it. From the language of the section referred to· it is apparent that it does not contemplate that two prosecutions under the·same indictment may be pending at one and the same time and in different courts, as was the case here; but the very next section of the statute, section 1116, provides that where one or some only of several defendants charged in the same indictment be granted a change of venue the original indictment shall be retained and a certified copy sent which shall serve in lieu of the original.

It is true that the last named section seems to refer to cases only wherein change of venue is granted upon the application of defendants who are jointly indicted with others, and does not prescribe the same mode of procedure when such change of venue may be granted upon the motion of the Commonwealth. But in any event the last named section points out a common sense mode of procedure for the Commonwealth in such circumstances, and that method has been strictly followed in this case.

There is no pretense or suggestion that the copy of the indictment under which appellant was tried was not in every respect a true and correct copy of the original, and in no event could his substantial rights have been affected.

After the introduction by the Commonwealth of certain evidence about other raids in that county and particularly after the admission of the evidence as to the whipping of one Jim Ray, which occurred after the whipping of the Websters, the appellant filed his affidavit and entered a motion to set aside the swearing of the jury and to continue the case on the ground of surprise. The affidavit states, in substance, that the evidence showing that he had been connected with and was present at the whipping of Ray, was a surprise to him and that he had been advised by his attorneys that such evidence would not be competent on his trial in this case and that if given an opportunity he could show by divers persons, without naming them, that he was not present and did not participate in the whipping of Ray. His affidavit did not show, however, where he was at the time Ray was whipped or the name of any witness by whom he could show his whereabouts, but merely stated in a general way that if given an opportunity he could establish a complete and satisfactory alibi. Manifestly this affidavit could not be in any event read as the deposition of any witness, for the name of no witness was mentioned in it, and the court under these circumstances did not abuse its discretion in overruling the motion for a continuance, and particularly when it is considered that this evidence did not bear directly upon the guilt or innocence of the defendant on the charge involved, but had been admitted by the court only for the purpose of showing that appellant was a member of the organization known as "Possum Hunters."

The instructions in this case authorized the jury to inflict a penalty of not less than one nor more than fifteen years' confinement in the penitentiary if they found the defendant guilty, and it is the contention of the appellant that this is unauthorized by the statutes, and that the penalty fixed by the statute for this crime is not less than one nor more than five years. This contention involves an interpretation of section 1241a, Carroll's 1915 Kentucky Statutes, dealing with the offense of criminal conspiracy, and the three sub-sections of that statute;

in so far as they relate to this question, they are as follows:

"1. If any two or more persons shall confederate or band themselves together for the purpose of intimidating, alarming, disturbing, or injuring any person or persons, or to rescue any person or persons charged with a public offense from any officer or other person having the lawful custody of any such person or persons with the view of inflicting any kind of punishment on them, or with the view of preventing their lawful prosecution for any such offense, or to do any felonious act, they, or either of them, shall be deemed guilty of a felony, and upon conviction shall be confined in the penitentiary not less than one nor more than five years.

"2. If any two or more persons shall confederate or band together and go forth, for the purpose of molesting, injuring or destroying any property, real or personal, of another person, persons or corporation, whether the same be injured, molested or damaged or not, they shall be guilty of a felony, and upon conviction shall be confined in the penitentiary not less than one nor more than five years.

"3. If any injury shall result to the person or property of any person or persons, by reason of any unlawful acts denounced in the preceding section of this act, the person or persons engaged or participating, or any one of them, or any one aiding or abetting such unlawful act, shall be guilty of a felony, and upon conviction shall be confined in the State penitentiary not less than one nor more than fifteen years, unless death should result, in which case the penalty for such offense shall be as now prescribed by law."

Sub-section one of the statute quoted relates wholly to offenses against the person, and sub-section two deals only with offenses against property, and the two offenses were evidently described and denounced by different sub-sections because it was intended to make a conspiracy to injure the person a complete offense without a "going-forth," while it is an essential element where the injury of property only is the object of the conspiracy there should be a "going-forth." Sub-section 3 then provides that when there actually results injury either to the person or property of any person or persons by reason of the conspiracy denounced in the preceding section that the penalty shall be not less than one nor more

than fifteen years, it evidently being the purpose of the Legislature to raise the maximum of five years to a maximum of fifteen years where there is actual injury to person or property. Appellant's whole argument on this point is that the use of the singular "preceding section" in sub-section three refers only to conspiracies to injure property and does not embrace conspiracies to injure the person denounced by sub-section 1.

To adopt this construction would be to say that the Legislature had done an absurd thing; that is to say, that it had fixed a maximum punishment of five years for entering into a conspiracy to injure the person and executing that conspiracy, and at the same time and in the same act had authorized the infliction of a maximum punishment of fifteen years for entering into a conspiracy to injure property only and executing that conspiracy. We entertain no doubt that it was the Legislative purpose in sub-section 3 to embrace in its provisions the conspiracies denounced by both sub-section 1 and sub-section 2, and to provide that when either injury to the person or property should result from such conspiracies the maximum penalty should be fifteen years. If the contention of appellant was correct there would have been in sub-section 3 no reference whatsoever to an injury "to the person," and the very context of that sub-section is inconsistent with any other interpretation than the words "preceding section" were intended to be "preceding sections."

A further objection to the instructions is that they authorized a conviction if appellant had entered into a conspiracy with others than those jointly indicted with him to injure the Websters. It is quite true that the indictment only charges that the persons named therein entered into the conspiracy, but it does charge that the defendants named and others whose names are unknown did go forth in the night time armed for the purpose of carrying out the conspiracy. The instructions, however, did authorize a conviction if the defendant, Jenkins, and the other named defendants, or any of them, or other person or persons, banded and confederated themselves together.

The evidence of the Websters disclosed that a large number of other persons were present besides the named defendants who were not recognized; but one of the Websters did claim to have recognized one man as a member

of the party who was not named in the indictment, to-wit: Hal Brown.

There is no contention that there was not evidence of conspiracy between Jenkins and some of the others named in the indictment, but only that the instructions authorized the conviction of Jenkins if he was in a conspiracy with any others than those named in the indictment. The fact, however, that *all* the conspirators were not known to the grand jury, but only part of them, and that only those named were charged with the conspiracy does not prevent the conviction of those so charged. From the evidence it might well have been found that the indictment did not embrace *all* of the conspirators, but it was amply sufficient to sustain the charge of conspiracy against those who were charged. If an indictment charges a conspiracy by two or more persons, naming them, and the evidence discloses there were others in the conspiracy, those charged may be convicted just as if all the conspirators had been charged.

It may be admitted in this case that the instructions did not closely follow the charge in the indictment, but the evidence of conspiracy between those who were charged is so convincing and the motive is so clearly shown—Jenkins being the leader of the "Possum Hunters" and Silas Gardner being the father of the wife of Estil Webster, who was supposed to have been mistreated by the Websters—it is so perfectly apparent that the jury found the conspiracy to exist between those charged that the error could not have been prejudicial.

It is suggested in appellant's brief, but not urged, that the second instruction is erroneous because it authorized the conviction of appellant even though he was not present in person when the whipping was executed. The very language of sub-section 3, quoted above, authorizes such an instruction; it contemplates, from its very language, that if any injury shall result to the person or property from the original conspiracy even though part of the original conspirators may not be present when it is carried out that they shall be guilty under its terms.

And, finally, we have the question as to the admissibility of the evidence of similar raids occurring in that locality at about the same time, all except one of them before the Webster whipping.

The Commonwealth first showed the organization of this order at Union Chapel on the 22nd of August, 1914,

and showed that appellant was a member of that order; it then showed, to some extent, the nature and purpose of that organization; it also showed that shortly after its organization, bodies of armed and masked men began to commit in that locality outrages similar to the Webster whipping; it showed that the members of this organization met in the night time at isolated places; it showed their mode of procedure upon these occasions by the statements of appellant himself; it unmistakably showed by many facts and circumstances that all of these occurrences were traceable to this organization; it showed by the evidence of the four Websters that appellant and several of those mentioned in the indictment as co-conspirators were present at the house of James Webster and participated in the whipping. It was after the introduction of all this evidence that the Commonwealth evidently anticipating an effort to prove an alibi, the customary defense in such cases, was permitted to show that other and similar occurrences had taken place in that locality, and that at least in two instances appellant was present and participated in those occurrences, and that upon other occasions when similar things happened appellant was recognized late at night with bodies of armed men going toward or coming from the direction where the whipping occurred. Upon each occasion when such evidence was admitted and the defendant was shown to have participated in them or to have been present, or to have been seen on the road, the jury was admonished that the evidence was admitted only for the purpose of showing that appellant was a member of this organization, and was not admitted to show his guilt or innocence of the whipping of the Websters. Not only did the court take this precaution at all times during the trial, but in its written instructions to the jury it reiterated the same.

In such cases of organized outlawry usually the most carefully planned arrangements are made in advance either to hide or destroy all evidence of guilt. The parties wear masks, turn their clothes inside out, as in this case, and adopt what they conceive to be the surest method of concealing their identity. Not only so, but experience has taught that in such cases it has almost grown to be a custom that a carefully considered and arranged alibi, prepared in advance, is ready for any occasion.

It was under these circumstances and under these conditions that the court, in a case where the only issue

was as to the identity of the appellant, permitted evidence to go to the jury as to other crimes of a similar nature, committed about the same time, in the same locality, and in practically the same way, solely upon the issue of identity. The evidence was admitted solely for the purpose of fixing with greater certainty the identity of these disguised outlaws by showing their membership in and connection with this unlawful organization, the similarity of their mode of procedure in other raids about the same time, and it may well be doubted that but for the admission of such evidence in the light of these carefully considered and prepared-in-advance alibis that a conviction could ever be had in such cases.

Where the sole issue in a case is as to the identity of the accused the evidence on that issue by the Commonwealth may be properly permitted to take a wide range, and, in a measure, the rigid rules of evidence will be relaxed. The case of Morse v. Commonwealth, 129 Ky., 294, was where the defendant had sold warehouse receipts for whiskey and had embezzled the proceeds. It was conceded that the sale had taken place and that the proceeds had not been accounted for, the only defense being that another and not the defendant had committed the crime, as in this case. In that case it was held proper to admit evidence of similar transactions by the defendant with other persons, under a name which he had assumed, in order to identify him as the man who had sold the receipts for which he was being tried. The court in that case said:

"When the defense of a person is that it was not himself, but another, who committed the crime, the evidence in behalf of the Commonwealth may be permitted to take a wide range for the purpose of developing the past life and history of the accused and the names he has assumed, to the end that he may be identified under those assumed names as the person who committed the offense under investigation; but if, in the course of the evidence brought out in the elucidation of these facts, it should appear that the accused had been guilty of some other offense, the court should at the time admonish the jury that they should not consider evidence of other offenses as even tending to show his guilt of the crime for which he was being tried, but that it was only competent for the purpose of establishing the identity of the accused and

to illustrate that at different times he had assumed various names."

From the nature of the crime itself it is difficult to prove a criminal conspiracy by direct evidence and such conspiracies are most always proven by circumstantial and "piece-meal" evidence; and in consideration of this fact in such cases great latitude must of necessity be given the Commonwealth in the production of its evidence. Cyc., vol. 8, page 678, in discussing the admission of evidence in cases of conspiracy, says:

"In the reception of circumstantial evidence great latitude must be allowed. The jury should have before them every fact which will enable them to come to a satisfactory conclusion. And it is no objection that the evidence covers a great many transactions and extends over a long period of time, provided, however, that the facts shown have some bearing upon, and tendency to prove, the ultimate fact at issue. But much discretion is left to the trial court, in a case depending on circumstantial evidence, and its ruling will be sustained if the testimony which is admitted tends even remotely to establish the ultimate fact."

And again, the same work, under the same head, at page 684, in dealing with the introduction of evidence in conspiracy cases, says:

"Where the guilt of a party depends upon the intent, purpose, or design with which an act is done, or upon his guilty knowledge thereof, collateral facts in which he bore a principal part may be examined into for the purpose of establishing such guilty intent, design, purpose or knowledge. It is sufficient that such collateral facts have some connection with each other as a part of the same plan or as induced by the same motive, and it is immaterial that they show the commission of other crimes. The evidence in a conspiracy is wider than perhaps in any other case. Taken by themselves, the acts of a conspiracy are rarely of an unequivocally guilty character, and they can only be properly estimated when connected with all the surrounding circumstances."

We are not unmindful of the wisdom of the general rule that evidence of one crime is not admissible to prove another, but we are of opinion that under the circumstances of this case, where the only issue was one of identity, that the evidence was admissible with the proper admonition by the court.

The enormity of the crime is to be considered from more than one aspect. Not only does the inhuman, cruel, heartless beating of this old woman, sixty-five years of age—to say nothing of the younger woman and man— merit even a severer punishment than the maximum fixed by the statutes; but when we contemplate this organized effort to supplant the courts in the administration of justice, this defiance of the established order of things, this substitution of mob-rule for government by law, these farcical secret trials had in the absence of the intended victim, these bold efforts to intimidate public officials, the case becomes one of all-absorbing public interest, and raises the question whether there is, in fact, a government by law in this State.

If we are to return to a state of savagery in which men are deterred from indulging their vicious tendencies only by a fear of the hereafter, then, and not until then, will such brutal organizations be permitted to defy organized society; then, and not until then, will we be compelled to admit that our whole social fabric is builded upon sand and must sink.

But as long as we have honest, faithful and fearless public officials such as brought appellant to the bar of justice in the face of great difficulties, and even personal danger to themselves, we may confidently indulge the hope that this cancerous growth upon the body-politic will be speedily and permanently eradicated and that this organized mob will soon realize that *the law* is yet supreme in Kentucky.

Judgment affirmed.