## Jordan v. Commonwealth.
(Decided June 11, 1935.)

SHUMATE & SHUMATE for appellant.

BAILEY P. WOOTTON, Attorney General, H. HAMILTON RICE, Assistant Attorney General, and JOHN W. WALKER, Commonwealth's Attorney, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

The appellant, Shelby Jordan, was indicted by the Estill county grand jury for the offense of maliciously shooting at, without wounding, another with intent to kill. He was tried, convicted, and sentenced to two years in the penitentiary. He appeals.

Appellant does not deny shooting, but he denies that he shot at the prosecuting witness, Jesse Thomas, with intent to kill him, but contends that he shot into the air for the purpose of scaring Thomas, because, he says, he thought Thomas was going to attack him with a knife.

It is insisted for appellant as ground for reversal that there is no evidence, or at least insufficient evidence, to sustain a verdict for a felony; and, at the most, the evidence only conduces to show that appellant committed a misdemeanor and that the jury should have found him guilty under the misdemeanor instruction given by the court.

There was produced for the commonwealth, in substance, the following state of facts:

Thomas, the prosecuting witness, was a merchant in Estill county, conducting a grocery store, and also a gasoline station in front of his store. On a Sunday morning in July, 1934, Thomas went to his store and saw appellant and a number of others in the road or on the premises near about his store. He opened the store and went in, and two or three of those present came into the store to buy some groceries, and Thomas told

them he would let them have the groceries, but as soon as he waited on them he was going to close the store. Ben Jordan, a brother of appellant, came into the store and asked for a bottle of pop, and Thomas told him that he did not care to start selling pop, and that he was going to close the store and would not sell anything more that day.

He describes what happened as follows:

"Q. Begin at that point and tell what happened—You locked up your place did you? A. I disremember whether I locked it then or not.

"Q. Tell what you did do? A. I was sorter excited, but as I was fixing to lock or making an attempt to lock the door, I looked around and I saw Shelby and he didn't say a word to me but I saw him open his shirt like he was going to get a gun and he was looking right at me and looking me in the eye and he looked very pale, and I turned my back to make another attempt to fasten the door but I don't remember whether I got it fastened, and I looked at him again but I don't remember whether he got the gun.

"Q. Did he get the gun out? A. I just saw the handle of the gun, and I don't know whether he got it out, I didn't take time to see; but I would like to tell you what I did do.

"Q. Go ahead and tell what you did do and what he did that you know? A. Well, here is the door to the store, and here is the pump and I put my pump on a line. Anyway I had the door right in the center; well Jordan was standing along about here (indicating) possibly in appearance six or seven feet from I was at right at the door; Ben Jordan had come out and gone this was (indicating) and I didn't know where he was at, I didn't look to see, but I thought when he was getting the gun to shoot me, my first thought was to get behind the pump and I got. I heard a gun fire but I kept going, and I was going up and going up to where Babe Moore's house, and I saw Babe Moore's little boy right in front of me, and I turned to my left a little, to get around Babe's boy, and I went around the house and went in at the door, and I

was there a few minutes, and I went on home; and when I turned I looked and I saw Shelby standing over there with the gun, and then I kept running and between Babe Moore's house here (indicating) and his barn he fired two more shots at me, and then is when I heard the bullets whiz, and I kept going until I got to the house.''

Thomas further testified that when he saw appellant attempting to get his pistol he then started to run, but did not see him shoot, and was unable to say whether the shots were fired at him or into the air, or some other direction, as claimed by appellant, except that when the last two shots were fired he heard bullets whiz.

Frank Tuttle testified that he was present and he heard the door slam, and about that time appellant "put his hand up this way with his pistol (indicating) and about that time I heard Mr. Thomas running across this way (indicating) and he shot two shots across this way and he went on around the house, and I got my mule and left * * * and I didn't know anything more.'' He said that there were a few shots fired at Thomas while he was crossing the highway. He was asked on cross-examination how he knew the shots were fired at Thomas, and he answered, "I could see him shooting at him''; he was holding the pistol "straight out from him (indicating).''

Harlan Curtis testified that he was at the store and saw appellant and others there near the store, and appellant was standing very close to the filling station and "he looked like he was trying to unbutton his shirt someway.'' This witness had started home when the shooting occurred, and he did not see what actually happened, but he said he heard two shots fired and after he had gone on about 100 yards or more he heard two more shots fired. Joel McKinney testified that on the night before the shooting occurred he saw appellant about Thomas' store and heard him tell Thomas that "he was going to shoot that place all to pieces.'' He said appellant was drunk at the time he made the statement.

Appellant testified that when Thomas came out of the store he looked at him and said, "You son of a b——, you, get away from here,'' and when Thomas

said that he pulled his gun. He said he could not tell what Thomas had, but he had something in his hand, and that he shot into the air but did not intend to hit him. He said that he and Thomas had always been good friends, and there had been no previous trouble between them, and did not know that Thomas had anything against him, but when Thomas called him the vile name and took a step toward him it scared him and "about the time he wheeled I thought, I will shoot and scare him, rather than let him come back and shoot me or cut me; I didn't mean to harm him." Ben Jordan, appellant's brother, testified that when Thomas came out of the store he called appellant the vile name testified to by appellant and ran his hand in his pocket and had a knife in his hand, and appellant shot into the air and not in the direction of Thomas. Another witness for appellant stated that appellant shot into the air and not in the direction of Thomas.

Thomas denied that he called appellant the vile name testified to by appellant and his brother, and said that he only said to appellant, "Don't shoot me, I have nothing to fight with." Another witness who was present testified that he heard Thomas say something, but he did not understand what he said.

The court instructed the jury upon both phases of the case, in substance, that if the jury believe from the evidence that appellant shot at the prosecuting witness with malice aforethought that they should find him guilty of a felony, but if the shooting was done in sudden affray and without malice that they should find him guilty of a misdemeanor.

It is insisted for appellant that the evidence failed to show any malice, and that under the instructions of the court the jury was without right to find appellant guilty of a felony.

It is not shown by the evidence that there had been any previous trouble between appellant and Thomas. The only evidence indicating that any ill feeling existed between them was that on the night before the shooting appellant had said that he was going to "shoot this place all to pieces." But of course there is no motive shown for that statement so far as any ill feeling is concerned. However, it must not be overlooked that malice does not necessarily have to be shown by direct

evidence. It may be inferred from the actions of the accused, the circumstances of the offense, and the manner of its commission. It is a deduction to be made by the jury from the evidence and the circumstances.

If, as contended by appellant, the shots were fired into the air, or not in the direction of Thomas so as to indicate that appellant intended to shoot him, an intent to kill was not shown. But the evidence being conflicting the jury had the right to believe the witness for the commonwealth who testified that appellant shot at Thomas. Thomas says that he heard the bullets whiz, and another witness testified that he was looking at appellant at the time he was shooting and that he was shooting at Thomas. This evidence was sufficient to warrant the jury to find that appellant did shoot at Thomas, and with intent to kill him. It is the well-established rule that the court will not reverse the verdict of the jury because the jury gave greater weight to the evidence of one set of witnesses than it did to that of another, Maggard v. Commonwealth, 232 Ky. 10, 22 S. W. (2d) 298, and it is the province of the jury and not of the court to determine the guilt or innocence of one charged with the crime, and a jury's verdict given under proper instruction will not be disturbed if there is any competent evidence supporting it. Moore v. Commonwealth, 223 Ky. 128, 3 S. W. (2d) 190.

Appellant admits that Thomas was running or had turned to run when he fired the first shots, and this dissipates any basis for his plea of self-defense. The only questions are whether or not he shot at Thomas, and that such shooting was done maliciously. Another fact which may be of some significance is that after Thomas had taken refuge in Moore's house after the first shooting, and when he was fleeing from the house, appellant then fired two more shots at him, and this is when Thomas says he heard the bullets whiz. In view of the fact that some interval of time had lapsed between the first and second shootings, and while Thomas was still fleeing, the jury had the right to believe, and perhaps did so believe, that there was a determination on part of appellant to kill Thomas.

In view of the proven facts and the attendant circumstances, we are unable to say that the verdict is so palpably against the evidence as to induce the belief

that it was given under passion or prejudice, and, having these views, we are unauthorized to disturb it. McCurry v. Commonwealth, 205 Ky. 211, 265 S. W. 630; Stephens v. Commonwealth, 226 Ky. 437, 11 S. W. (2d) 111.

Finding no error prejudicial to the substantial rights of appellant, the judgment is affirmed.

The whole court sitting.