# Martin v. Commonwealth.

(Decided June 4, 1937.)

(Rehearing Denied Oct. 1, 1937.)

C. R. LUKER and A. T. W. MANNING for appellant.

HUBERT MEREDITH, Attorney General, and JESSE K. LEWIS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

The grand jury of Laurel county returned a true bill charging Dan Martin and his wife with the murder of Charley Benge. The indictment is out of the ordinary, since it charges the shooting occurred in Clay county, but that after the mortal wounds were inflicted Benge died, as a result thereof in Laurel county. Upon a separate trial appellant was found guilty of manslaughter and his punishment fixed at confinement in the penitentiary for twenty-one years. He appeals.

The shooting occurred in Clay county not far from the Laurel county line, shortly after dark on Saturday, May 30, 1936. On that afternoon, according to appellant's testimony, two or three of appellant's boys had

gone to a meeting at the cemetery down the creek from his home. They were delayed in getting home, and his wife and granddaughter had gone down the road to look for them. About a half hour after the two had left, appellant says he heard some shooting from the direction in which they had gone. He went to a rack, procured an automatic shotgun, and, after seeing that there were loaded shells in the magazine, started down the creek. The shells were loaded with buckshot, or a large size shot. As he proceeded, he says he heard more shooting and could hear some one begging, and a voice or voices telling some one to go back up the road or die. As he got nearer, he saw his wife coming up the road and behind her two boys on a mule, driving her up the road. He watched for several moments, the boys on the mule still driving her, and occasionally shooting around her. As they got nearer to where he was, in the road or in a field just off the road, he said to the boys, "Go on down the road and let this old woman alone," and at this time they began to shoot at him.

Appellant admits that he then fired two shots from his shotgun; saw the mule drop. He says that he recognized Benge, but did not know who was with him. He also says that he did not know that Benge was down the road that night, and that he had theretofore had no trouble with him or Cupp, who was one of Benge's companions. It was admitted by appellant that he had theretofore been actively interested in the prosecution of a brother of deceased for the killing of appellant's son-in-law. His testimony, in the main, was substantiated by his grandchild, who was with his wife.

It was shown by the commonwealth that deceased and Dan Cupp were riding a mule, Raymond Cornett on another mule, accompanying them, down the creek. They came to where appellant's wife and Ollie Hammond were standing on the right side of the road. The three eyewitnesses say that the following conversation took place: "She [Mrs. Martin] said, 'Where are you going? and Benge told her he was going to Bob Houses,' and she said, 'You had better go back up that road,' and Benge said, 'No, we have started to Bob's house.'" At this point the witnesses say that appellant, who was in the field just off the road, spoke up and said, "You better go back up that road," and the wife said, "Kill them," and appellant at once fired. His first shot missed, and he then fired two other shots which took

effect mainly on Benge and the mule. Cupp received one buckshot wound. The mule, which was also killed, went down throwing Benge on his back. Cupp says he then fired in appellant's direction five or six times, and Benge who was lying on his back fired several times in the air. Cornett and Cupp left Benge lying on the ground and went to a neighbor's home seeking aid for him.

The only other evidence which tended to throw any light on the occurrence was that of persons living in the neighborhood who heard the sounds made by the firing of the weapons. A number testified for the commonwealth and were positive from the reports that the shotgun was fired first; some say two and others three times, and that the pistol shots came afterwards, thus bearing out the testimony of the commonwealth's eyewitnesses. Others—and the numbers are about equal —testify that the pistol shots came first, then the shotgun, and then more pistol shots. The testimony of the witnesses for the commonwealth appears to have been more direct and positive.

On motion for a new trial, a number of grounds were urged in support, and in brief few if any are abandoned. It is first urged that the case did not stand for trial on the day it was tried. Counsel says (and the record shows) that appellant and his wife were indicted on June 10, 1936, on which day a bench warrant was issued, with bond indorsed at $3,000. The sheriff executed the bench warrant on July 3, and took bond. It is argued that the bond did not fix any time or place when appellant should appear, and there had been no order of court assigning the case for trial. The bench warrant directed the accused to answer an indictment in the Laurel circuit court, the bond obligating the appellant to appear before the court, and therein stated the time and place to answer said charge. On October 27, the case was called for trial and the commonwealth answered "ready" and the defendant "not ready" and moved for a continuance, filing in support thereof his affidavit.

The affidavit, as far as we observe, made no reference to any alleged defect in the bench warrant, bond, or to any omission of an order fixing the date of trial. The affidavit set out the fact that appellant's wife was a necessary witness and that she was ill at the time and could not appear. He also named other witnesses who

would truly testify to facts showing his innocence, and says that the proper effect of their testimony could not be had without their presence. The court overruled the motion for a continuance, and we think properly so, first on the ground that on appellant's separate trial the wife could not testify, and that the affidavit as 'to what she, or other named witnesses would testify, disclosed nothing more than conclusions, without any attempt to detail facts.

As said, the motion did not raise any question of improper or illegal procedure, nor did the affidavit make any reference thereto. The procedure here was in strict conformity with sections 186 and 187 of the Criminal Code of Practice, and opinions construing same. Breeding v. Com., 190 Ky. 207, 227 S. W. 151. Aside from this, appellant was present in court when his case was called, and he had from July 3 to October 27, to make preparation for his trial. We conclude that there was no error in respect to the matter urged.

2. It is contended that the court did not have jurisdiction to try appellant because the deceased was "shot and killed in Clay county," the argument being that there was not sufficient proof that Benge died in Laurel county. As disclosed by the evidence, the shooting occurred in Clay county near the Laurel line. One Cornett procured a truck and placed Benge in same for the purpose of taking him to a hospital in London. At the time he placed him in the truck, Benge could be heard breathing; as witness proceeded on his way, he says: "He moved his arm before we got to Johnson hill, lifted his arm up." On being asked "Whereabouts did he die, in Clay county or Laurel county?" he answered, "He died in Laurel county." "Q. As a matter of fact do you know he was in Laurel county before he died? A. Yes sir."

Section 1147, Kentucky Statutes, provides:

"If a mortal wound or other violence or injury be inflicted * * * in one county * * * and death ensues in another, the offense may be prosecuted in either."

The appellant was indicted and arrested in Laurel county, and without seeming objection executed bond and subjected himself to the jurisdiction of that court. The case cited by appellant Com. v. Apkins, 148 Ky. 207, 146 S. W. 431, 39 L. R. A. (N. S.) 822, Ann. Cas. 1913E, 465, is not applicable here. More nearly ap-

plicable and conclusive of the contention are Spradlin v. Com., 221 Ky. 372, 298 S. W. 952; Clemons v. Stoll, 197 Ky. 208, 246 S. W. 810. The unequivocal statement of the witness was to the effect that Benge died in Laurel county. No contrary proof was offered.

3. This ground is that after trial had proceeded the court should have continued the case to another day, and in support appellant filed affidavit, in which he shows that Laura Benge had been subpœnaed, and had failed to appear, through no fault on his part. It was claimed that this witness would say that the day after the shooting Dan Cupp, who was an eyewitness to the homicide, had stated in her presence that at the time appellant shot and killed Benge he (Benge) was shooting over the head of appellant's wife, and cursing her. This was said to have been important, because appellant had no other witnesses by whom he could prove these facts.

It will be noted that this affidavit was filed after the trial had progressed for some time. A warrant of arrest had issued against Laura Benge and had been served, bond being taken for her appearance, but she failed to appear. Appellant called Dan Cupp, a witness for the commonwealth, and he was asked out of the hearing of the jury if he had made the statement attributed to him by Laura Benge. He denied this. Here the evidence to be procured was not of substantive nature. The purpose of procuring the attendance of Laura Benge or of reading her affidavit was to impeach the witness Cupp. It is in the discretion of the court to allow continuance, or reading the affidavit of an absent witness, where the evidence is of this nature alone. Sizemore v. Com., 108 S. W. 254, 32 Ky. Law Rep. 1154; Phelps v. Com., 209 Ky. 318, 272 S. W. 743. See particularly Hays v. Com., 140 Ky. 184, 130 S. W. 987; Mullins v. Com., 79 S. W. 258, 25 Ky. Law Rep. 2044; Miller v. Com., 200 Ky. 435, 255 S. W. 96. The court did not abuse that discretion in refusing continuance.

4. It is complained that the commonwealth was allowed a severance of trial after the jury was sworn. On this point the record shows that when the case was called for trial the commonwealth announced "ready" and the defendant "not ready" and appellant moved for continuance and filed his affidavit showing that his wife was ill and could not attend court.

Another order of the same day recites that the de-

fendants each announced ready for trial, and the selection of the jury was begun. Only ten of the regular panel was present. By agreement of parties the judge drew from the wheel. On the next day the jury was completed and at this point an order recites:

"On yesterday, the commonwealth by counsel moved the court for a severance of the trial, at which time Maggie Martin was not in court, but she is present in court today, and the jury is sworn as to both defendants. The commonwealth is insisting upon a severance * * * and to this the defendants and each of them object. Maggie Martin was not in court on yesterday when the selection of the jury was begun; seven of the jury having been selected by both sides. The court is of the opinion that the motion to sever should be and is sustained, and the defendant Dan Martin was elected by the commonwealth to be tried first. To all of which the defendants object and except. When the selection of seven of the jury was perfected on yesterday, Maggie Martin was not present, therefore Dan Martin alone was on trial."

Appellant thereupon waived arraignment, entered a plea of not guilty, but at this point made no motion for continuance, or to discharge the jury. Appellant complains that motion for severance comes too late after the jury is sworn, and cites the case of Radley v. Com., 121 Ky. 506, 89 S. W. 519. In that case it was found that motion for a severance was not made by the accused until after the jury was sworn, and we held that it was too late, because jeopardy began with the swearing of the jury. In this case the order recites, that the motion was made prior to the selection of the jury. It was reasonable for the court not to pass on it at that time, because of the affirmative showing made by appellant as to his wife's absence on account of illness. The codefendant may be able to make complaint on her trial that she has once been in jeopardy, a matter not now considered. We have held that the commonwealth may claim a severance, which the court in his discretion may allow. Jenkins v. Com., 167 Ky. 544, 180 S. W. 961, 3 A. L. R. 1522; Drake v. Com., 214 Ky. 147, 282 S. W. 1066; Hoffman v. Com., 134 Ky. 726, 121 S. W. 690.

5. There are nine pages of appellant's brief taken up by argument on alleged incompetent evidence, and several as to rejected evidence. It would take too much

time and space to discuss each contention separately. We have read the evidence including the rebuttal testimony, but can find no instance of any evidence admitted or rejected which appears to us to have been so admitted or rejected to the prejudice of the substantial rights of the accused. Counsel in pressing many of his objections seems to have overlooked the fact that appellant admitted that he shot some person, unknown to him, on the occasion, but who was without doubt Charley Benge. Much of the complained of rejected evidence was in effect cumulative.

6. It is here complained that the wife was not permitted to testify. She did testify before the court in the absence of the jury, and the court, after hearing her testimony, declined to permit her to testify before the jury. Under section 606 of the Civil Code of Practice, which is applicable in criminal trials, we have held that where a husband and wife are jointly indicted for an offense and tried together, each may testify for himself or herself, but if they are separately tried, then one cannot be a witness for the other. Allen v. Com., 134 Ky. 110, 119 S. W. 795, 20 Ann. Cas. 884. The general rule is that a wife may not testify for her husband in a criminal case. Turk v. Com., 239 Ky. 55, 38 S. W. (2d) 937; Winstead v. Com., 236 Ky. 154, 32 S. W. (2d) 749.

We have above set out in detail what occurred in regard to the severance of trials, and it is clear from that statement that at no time in the procedings did appellant conceive that his wife was really on trial, and counsel's only insistence that her testimony was competent is based on the ground that though there was a severance it came too late, and the wife was on trial. Our conclusion on the severance argument is decisive of this contention.

7. It is argued that instruction No. 1 was prejudicial because the court told the jury that if they should believe from the evidence beyond a reasonable doubt that appellant willfully and feloniously shot and wounded Benge in Clay county, and that from such shooting he thereafter, within a year and a day, died in Laurel county, they should find him guilty of murder, if the shooting was with malice aforethought; of manslaughter if in sudden heat and passion.

The whole argument here is predicated upon the idea that the court had no jurisdiction, as argued in

ground No. 2. It is contended that the court should have instructed the jury to find defendant not guilty under this state of facts, though we note the lack of motion for peremptory. We pass this contention with the comment that the ground urged is sufficiently answered in a discussion of ground No. 2 supra.

Instruction No. 3 on self-defense is criticized. That instruction reads:

> "If you shall believe from the evidence that at the time the defendant, Dan Martin shot and killed the deceased, Charley Benge, if he did so do, he believed, and had reasonable grounds to believe that he, or his wife, or his grandchild, or either of them, was, or were then and there in danger of death, or the infliction of some great bodily harm at the hands of the deceased, Charley Benge, or Dan Cupp, or Raymond Cornett, or either of them, and that it was necessary, or was believed by the defendant, in the exercise of reasonable judgment to be necessary to shoot and kill the said Charley Benge, in order to avert that danger, real or to the said defendant apparent, then you will find the defendant, Dan Martin, not guilty on the ground of self-defense or apparent necessity therefor, or the defense of another or others and apparent necessity therefor."

The criticism here is directed to the court's use of the words "either of them" with reference to appellant, his wife, and grandchild, and likewise with reference to Benge, Cupp, and Cornett. In other words, counsel insists on the substitution of the words "or any one or more of them," in each instance for the words "or either of them." This contention is one more with relation to a choice of words rather than error which would be calculated to prejudice the rights of the accused. In a strict grammatical sense, "either" is properly used with reference to each of the two, or one or the other; one of the two. However, the word may be, was formerly, and is now frequently used with reference to more than two; for any one of a group more than two. The court is fully satisfied that a jury of ordinary intelligence would understand from the instruction that the appellant had the right to use such means as appeared necessary to defend himself, his wife, or grandchild, or any one of the three; likewise the

jury would have no difficulty in concluding that the right to defend applied to an assault by any one of the three. It is difficult for us to believe that the jury would halt in its deliberations to go into an analysis of the correct use or application of the words "either of them." Beyond this, we find appellant saying that any shooting that was done on the occasion was done by Benge, and if any one else fired, it was from behind the mule on which Cupp and Benge were riding. It was not shown by any witness that Cornett fired a shot. Again appellant does not claim that he shot Benge in protection of his wife or grandchild. He very definitely said: "I shot to save my life." However, we need not discuss this point further since it is apparent that the instruction as a whole was not such as to prejudice any right of the accused.

8. One of the grounds in support of the motion for a new trial was the discovery of new evidence, not known to appellant or his counsel at the time of the trial, not discovered or discoverable by them until after the verdict.

The supporting affidavit filed by two witnesses, Dan Smith and Tommy Hinkle, is to the effect that they with Calvin Smith were fox hunting the night of the homicide, and had gone into the neighborhood where the shooting occurred, looking for one of their dogs. They claim that they were within 200 yards of the point when they heard the first shooting, and that it occurred 50 to 100 yards from where the second shooting took place; that shortly after the first shooting they heard an unknown man's voice cursing and telling some one to "get on up the road or I will kill you," the command accompanied by oaths. That this, in substance, was repeated several times. They also say they heard a woman's voice saying, "Lord have mercy, don't do that, I am going down the road looking for my boys." During this time they heard numerous pistol shots and then the report of two louder shots, which they took to have been fired from a shotgun, in rapid succession. They then heard other pistol shots and some talking. They say they did not know who was doing the shooting, and that after it was over they agreed not to talk so that they would not be witnesses; that being surprised at the verdict of the jury they then told their story to a brother of appellant. Appellant and counsel filed their separate affidavits in which they show that they had never

heard of either of these witnesses, nor of the facts which they related in affidavit.

The commonwealth filed the affidavit of Calvin Smith in which it was shown that he was not present on the night in question, and an affidavit of Alex Bruner, who says that Calvin 'Smith was at his home about 15 miles distant from the place of the homicide on the night it occurred. Sherman Benge also testified that he knew both Smith and Hinkle and that their general reputations for truth and veracity were bad; that they would swear to anything for a small compensation. The court correctly ruled that appellant's affidavit did not sufficiently warrant a new trial. His conclusion was based on a consideration of the allegations of the affidavit and counter-affidavit. The court below was no doubt disinclined to believe a witness who had knowledge of facts which they might believe to be of aid to a fellowman, and who concealed them because he did not desire to testify. The affidavit bears the stamp of an afterthought, and lacks the marks of verity.

9. It is finally contended that the verdict is flagrantly against the evidence. There was ample evidence to take the case to the jury. It is true the evidence was sharply conflicting. In such cases we will not disturb the verdict unless it is apparent that injustice has been done by the rendition of the verdict. Murphy v. Com., 255 Ky. 676, 75 S. W. (2d) 341; Barney v. Com., 258 Ky. 432, 80 S. W. (2d) 513; Jordan v. Com., 260 Ky. 11, 83 S. W. (2d) 855, and numerous cases cited in 6 Kentucky Digest, Criminal Law. The defendant had his defense placed fairly before the jury by instruction No. 3. He admitted the homicide, but said it was done in self-defense.

In this state of case the jury had the right to accept the proof of commonwealth or of defendant; there was sufficient evidence to support the jury's conclusion that the act was not committed in defense of appellant or members of his family. Under the state of facts, we cannot take the place of the jury, or assume its prerogative of weighing the evidence or passing on the credibility of the witnesses. Wireman v. Com., 268 Ky. 339, 104 S. W. (2d) 1083, decided April 30, 1937, and cases therein cited.

Judgment affirmed.