# Barney v. Commonwealth.

(Decided March 19, 1935.)

GOLDEN, LAY & GOLDEN for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

From a judgment sentencing him to the state reformatory for a period of twenty-one years, Oliver Barney appeals, contending that incompetent evidence favorable to the commonwealth was admitted and competent evidence in his behalf was excluded; leading questions were propounded by counsel of the commonwealth and improper argument was made by him in his closing address to the jury; the witnesses who claim to be eyewitnesses were not present at the time of the killing and their testimony is discredited; and the instructions are erroneous.

The evidence substantially is that the killing occurred in Middlesboro on the 26th day of February, 1934, where Gillis Rowlett, the accused, his brother, and most, if not all, of the witnesses resided. The automobile of Gillis Rowlett some time prior to, and on, the night before he was killed, "was blown up with dynamite." Early the next morning, with J. T. Sumner, he went to the office of a justice of the peace in Middlesboro to get a warrant for the person whom he suspected of having dynamited it the night before. In his statement to the justice, he accused Harry Hayes of the offense and endeavored to obtain a warrant of arrest for him. After hearing his statements, the justice advised that the information imparted by him was insufficient to justify the issuance of the warrant. Rowlett was mad at the time, but, acting on the suggestion of the justice, left without a warrant.

In his statement to the justice, as it is detailed by

434

the latter, he did not charge the accused and his brother, or either of them, with having committed the offense of destroying his automobile with dynamite. He did not mention the names of either of them in the presence of the justice. Therefore the court properly excluded the justice's testimony. After he and Sumner left the justice's office, Sumner claims that Rowlett stated to him "that the Barney boys had done it and that either he or Oliver Barney had to leave this world." Later in the day, Rowlett went to a barber shop near the place where the killing afterwards occurred, and, while in the act of being served by the barber, the barber and others claim he stated: "If the Barney boys or Harry Hayes come in, let me know." Within a few minutes a Ford roadster came up in front of the barber shop; Rowlett jumped out of the chair, a pistol fell out of his pocket onto the floor; he grabbed it, put it in his pocket, and rushed out in the street. The roadster was owned by Oliver Barney and at the time was being driven by his younger brother. On returning to the barber's chair, Rowlett remarked, "I had just as soon be in the penitentiary as for me and my wife to be blown up." From this point, it is shown by the evidence that Rowlett, Ray Edwards, Coby Edwards, and Buck West were in company with each other at different places up to the time of the killing. It is claimed by witnesses of the accused that while in the Crystal Cafe next door to the Fisher pool room where the killing occurred, Buck West and Ray Edwards had pistols and exhibited them, which the latter deny. It is shown, by the testimony of a number of witnesses, Rowlett at different times and places had made threats against Oliver Barney, none of which had been communicated to him.

During the day on which the killing occurred, the accused and his brother, Axley Barney, were at the former's home. The accused claims that about two weeks before the killing a stranger from Tennessee had pawned with him a pistol, and on the day of the killing the same individual had pawned with him another pistol. He had them at his home, and, on account of the presence of children, when he was ready to leave home that evening he took one of the pistols and delivered the other to his brother, Axley. About 6 o'clock he left home with the pistol and went directly to the pool room where the killing later occurred. Within a

few minutes after arriving, he began playing pool with Link Whitaker. The pool room was next door to the Crystal Cafe. Within about fifteen or twenty minutes, Gillis Rowlett and Ray Edwards came into the pool room; Rowlett remarked to the accused, "I want to see you, Oliver," and walked to the rear of the room; the accused followed behind him, and, on arriving at the rear of the pool room, Rowlett stopped, with his back against the wall and his hands in his overcoat pockets, then stated to the accused, who was at the time standing at the side of a pool table, facing Rowlett, "I want to know what you know about my car?" The accused responded, "I don't know anything, Gillis." From this point to the time of the killing, the remarks of the parties who participated in the tragedy are not agreed on by the witnesses. Gillis Rowlett and the accused began talking loud, and immediately a servant at the pool room left, went to a telephone and called Axley Barney who came at once traveling in the automobile of the accused. On his arrival, he went to the rear of the barber shop, where Rowlett, the accused, and Ray Edwards were. The persons present in the barber shop, including the living participants in the killing, fairly agree on the location of the parties engaged therein.

Coby Edwards and Buck West claim they entered the pool room immediately behind Gillis Rowlett and Ray Edwards, stopped, and remained near the front until the killing had occurred and the arresting officers arrived. Coby Edwards and West claim they were eye-witnesses from the beginning to the ending of the occurrence. They substantially agree in their testimony as to the location of the parties, the statements, actions, and conduct of the participants. They testified that Rowlett on reaching the rear of the pool room, stood with his back to the wall, his hands in his pockets, the accused about five or six feet in front of him; Ray Edwards leaning against the pool table. They narrate such portion of the conversation of Rowlett and the accused as understood by them, and witnessed the arrival of Axley Barney. They claim that Axley stopped and sat on or against a pool table and remained "sitting behind Ray Edwards" until the accused "got his gun and began to shoot at Gillis Rowlett" and Ray Edwards. It is disclosed by their testimony that the accused was facing Gillis Rowlett who was standing with

his back to the wall, hands in his overcoat pockets, at the time the accused began to shoot at him, and as, and after, he fell, continued to shoot into his body. At the same time, Axley Barney was shooting Ray Edwards in the back.

The accused and his brother admit that Rowlett was standing with his back to the wall, his hands in his overcoat pockets, and that he occupied this position, in this manner, during the entire time they were respectively present. The brother, however, claims that Rowlett was endeavoring to fire his pistols from his pockets. They say that on the arrival of Axley he said "Howdy" to Ray Edwards and Gillis Rowlett and then threw "his leg kinda over the corner" of a pool table, and at the time he did so he was facing the accused and Gillis Rowlett, with his back to Ray Edwards. After he occupied this position for a few minutes, the accused "heard someone grunt or say something"; when he looked around and observed Ray drawing a pistol, the accused exclaimed, "Look out, Ax!" then Ray Edwards wheeled, fired his pistol, "knocking Ax to his knees." Thereupon, the accused pulled his pistol and began to shoot at Ray Edwards, shot at him three times, then shot thrice at Rowlett. Axley was shooting during this time. They claim Ray Edwards fired two shots, the accused six, and Axley five during the melee. No shot was fired by Rowlett. The accused and Axley both claim that until Gillis Rowlett began to fall after he was shot, he was standing with his back to the wall with his hands in his overcoat pockets. Rowlett and Ray Edwards fell while the shooting was occurring and immediately died. The accused sustained no injury. They claim Ray Edwards' first shot wounded Axley in the hand. Their statement as to who fired the first shot is corroborated by other witnesses. Within a few minutes after the killing, the officers arrived and, on an examination, they found pistols in the outside pockets of Rowlett's overcoat and a bottle of whisky in an inside pocket. Neither of his pistols had been fired. However, one cartridge showed an impression which the officers claim had not been recently made. Near the body of Ray Edwards a pistol was found, two chambers empty and four loaded. The chambers of the pistols of the accused and Axley Barney were empty and showed they had been recently shot. Empty cartridges and also bullet holes in the pool tables and the walls of the building were observed

and located by witnesses. It is proper to state that a witness of the commonwealth claims Ray Edwards' pistol had two chambers empty before he entered the pool room, the same having been fired in his presence during the day.

The coroner of the county held an inquest and, while so engaged, examined the bodies of Rowlett and Edwards and located the wounds. He described them thus:

"Rowlett: shot in right bicep, two inches above elbow, ranging up coming out near center of arm. Wound in middle of left forearm ranging downward coming out two and half inches from wrist. Wound three and a fourth inches behind left ear making exit in one inch fracturing skull. One shot on right of median line ten inches from top of shoulder. One shot thirteen inches from top of left shoulder four inches from spine and straight from spine to left side. Edwards: Shot in right ear. Shot through finger on left hand. One hole two inches above right ear came out two inches back of the ear and lodged in neck. One hole in left leg half way between knee and hip, only flesh wound."

A map of the pool room purporting to show the room, the location of the pool tables, the parties engaged in the shooting, and the witnesses was prepared by, and introduced as a part of the testimony of, Coby Edwards. Its introduction was objected to on the ground Edwards was not qualified to prepare it and that there was no showing of his qualification. The location of the pool tables and other fixtures in the pool room and of the parties present were proven by a number of witnesses of both the commonwealth and the accused; and their statements as to the objects in the room and the whereabouts of the parties are substantially the same as shown by the map as it is described by Coby Edwards. The map is not a part of the record, and because of its absence we are unable to compare it for ourselves with the statements of the witnesses. It is sufficient to say with the evidence in behalf of the commonwealth and the accused substantially agreeing as to that which it is claimed the map disclosed, even though it was incompetent for any reason, its admission was not prejudicial to the accused's substantial rights.

The undertaker and embalmer testified that he observed a spot on the back of Rowlett's overcoat "that looked like it might be powder burn." The overcoat was introduced as evidence. It is argued that the undertaker and embalmer was not an expert and that his testimony in this respect was speculative and incompetent. Accepting this view of his statement as to the powder burn, the testimony of the coroner locates the wounds on the person of Rowlett. It is not disputed. It located shots in Rowlett's back. Hence, the admission of his testimony respecting the spot on the overcoat becomes immaterial; and even if it were an error to admit it, the evidence as to his being shot in the back being uncontradicted, its admission, if incompetent, was harmless.

On cross-examination of the accused and also Axley Barney, the commonwealth was permitted so to question them, as to call for an explanation on their part of the presence of the wounds on the bodies of Rowlett and Edwards, in the light of their testimony. It is true that the questions propounded to them called for answers in effect contradicting their theory and explanation as to how the killing occurred. Such questions were, and are, clearly within the range of permissible cross-examination of a witness, though the answers thereto reflected the prominence of a physical fact contradicting the witness' verbal testimony. We are not impressed that such cross-examination was improper or prejudicial.

The accused complains because the court, when overruling an objection to a question, suggested to the stenographer who was engaged in taking the evidence, in these words: "Give them an exception on everything." We observe nothing in the question to which the objection was made, the subject-matter embraced in it, the objection to the question, or in the quoted language of the court; nor in them altogether, indicating the mind of the court to the jury, in any respect; nor do we observe that the court's remark was improper, out of order, or calculated to influence the jury to any extent.

The undertaker minutely and particularly located and described the wounds in the bodies of Rowlett and Edwards. After having done so, the accused then inquired of him "if all the bullets in the body of Ray

Edwards came from the front." The question was objected to; the objection was sustained. Since the witness had previously answered it by detailing the facts, the question was a mere repetition. The court properly sustained the objection.

It is argued that the court refused to allow a witness to state that Rowlett rushed out of the barber shop with his hands in his pockets, at the time the automobile stopped in front of it. This argument is not in accordance with the facts. The witness stated that Rowlett did rush out of the barber shop into the street with his hands in his pockets, on the arrival of the automobile.

The record contains 277 pages of testimony. The accused in his brief lists eighteen questions which he claims are leading. It should be conceded that in the trying of such case, presenting 277 pages of evidence, that at least some leading questions would inevitably appear in the record. An examination of his listed questions discloses that a number of them is subject to the criticism presented, while others are not. The most, if not all, of them relate to minor and unimportant facts, and though leading, in the circumstances, this fact is not ground for reversal.

It is contended that the testimony of the accused's witnesses establishes so clearly that Coby Edwards and Buck West were not in the pool room at the time of, and during, the occurrence in which Gillis Rowlett was killed, their testimony is not creditable, and therefore insufficient upon which to base the verdict of the jury; that their testimony is perjured and it prevented the accused having a fair and impartial trial. A like criticism was made of a witness upon whose testimony alone the accused was convicted in Payne v. Commonwealth, 255 Ky. 533, 75 S. W. (2d) 14, 20. Of it, we said:

"The credibility of the witnesses and the weight that should be given their testimony are always questions for the jury. This court cannot regard only the testimony of the accused and her witnesses, and reverse on the ground of the insufficiency of the evidence. Hopper v. Commonwealth, 250 Ky. 405, 63 S. W. (2d) 467; American Mutual Liability Ins. Co. v. Hartman, 254 Ky. 712, 72 S. W. (2d) 429. It is a perfectly familiar rule that this court will not disturb the verdict of a jury on facts

unless it is palpably against the evidence. Meek v. Commonwealth, 249 Ky. 134, 60 S. W. (2d) 360; Lee v. Commonwealth, 250 Ky. 421, 63 S. W. (2d) 483; Jones v. Commonwealth, 250 Ky. 217, 62 S. W. (2d) 56, and cases cited.''

As was said in Maggard et al. v. Commonwealth, 257 Ky. 414, 78 S. W. (2d) 315, 317:

"The evidence in a criminal case will not be reviewed by this court to see if it justifies a conviction. Cornelius v. Commonwealth, 15 B. Mon. 539; Patterson v. Commonwealth, 86 Ky. 313, 5 S. W. 765, 9 Ky. Law Rep. 481; Blaylock v. Commonwealth, 239 Ky. 793, 40 S. W. (2d) 382. The de termination of the question of the guilt or innocence of the accused was exclusively within the province of the jury and not this court. Johnson v. Commonwealth, 244 Ky. 608, 51 S. W. (2d) 932; St. Clair v. Commonwealth, 245 Ky. 730, 54 S. W. (2d) 1; Miller v. Commonwealth, 236 Ky. 448, 33 S. W. (2d) 590. * * * We are without righ to disturb it because it is against the preponderance of the evidence. Adkins v. Commonwealth, 245 Ky. 503, 53 S. W. (2d) 949.''

These principles are especially applicable and controlling herein, and are a sufficient answer to the argument of the accused that the verdict is not sustained by the evidence.

Instruction No. 1 defines murder. The accused was not convicted thereunder, and, though it be erroneous for any reason, it cannot be regarded prejudicial. In his brief, the accused attempts to quote from one or more of the instructions, but does so incorrectly. Instruction No. 2 defines the crime of voluntary manslaughter and informs the jury of the punishment therefor. Of this instruction the accused in his brief writes: "As given by the court," it "omits the appellant's right to defend himself and his brother, Axley Barney, from Ray Edwards as well as the deceased, Gillis Rowlett." We observe that it contains this language: "And not in his necessary, or reasonably apparent necessary, self defense, or, the reasonably apparent necessary self defense of his brother, Axley Barney, so shot at and wounded the deceased, Gillis Rowlett," etc. The instruction is in the usual and approved form. Steeley v. Commonwealth, 129 Ky. 524,

112 S. W. 655, 33 Ky. Law Rep. 1032. Though instruction No. 2 be subject to the crticism made against it when it is read in connection with instruction No. 4, the ground for such criticism disappears. Instruction No. 4 in this respect reads: If "Oliver Barney shot and killed the deceased, Gillis Rowlett, if he did so, the defendant, Oliver Barney, believed, and had reasonable grounds to believe, that he, or Axley Barney, was then and there in danger of death, or the infliction of some great bodily harm on the defendant, Oliver Barney, by the deceased, Gillis Rowlett, or Ray Edwards, and that it was necessary, or was believed by the defendant, Oliver Barney, in the exercise of a reasonable judgment, to be necessary, to so shoot and kill the deceased, in order to protect himself, or Axley Barney, from such danger, real or to Oliver Barney apparent, then you ought to acquit him on the ground of self defense, or the defense of another, or apparent necessity therefor." The mere reading of this instruction is an answer to the accused's criticism of it. It clearly, properly, and succinctly defines the crime of voluntary manslaughter and the accused's right to defend himself and brother or either. It is true it contains the words "on the defendant, Oliver Barney," following the word "harm," otherwise it is in the usual customary approved form. It is our conclusion that its so containing these words does not have the effect of rendering it erroneous. It aptly informs the jury of the circumstances in which it should and its duty to acquit the accused "on the ground of self defense, or the defense of another (Axley Barney), or apparent necessity therefor."

Upon consideration of the whole case, we are satisfied that the substantial rights of the defendant have not been prejudiced by the words "on the defendant, Oliver Barney," as they are used in instruction No. 4. Section 340, Criminal Code of Practice, deprives this court of the power of reversal of a judgment of conviction, unless upon consideration of the whole record we are satisfied that the substantial rights of the accused have been prejudiced.

We perceive no reversible error. The judgment is affirmed.

Whole court sitting.