## Dean v. Commonwealth.

(Decided June 14, 1935.)

JAMES O. BAKER for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

On June 30, 1934, the appellant, Albert Dean, shot and killed Lee Napier at Crummies Creek, Harlan county, Ky. He was later indicted therefor, charged with the crime of willful murder, and upon trial was convicted of voluntary manslaughter and sentenced to twenty-one years' imprisonment.

He has appealed, asking a new trial upon the ground that the verdict "is excessive and contrary to the law and evidence."

The proof shows the following facts leading up to and surrounding this fatal shooting:

H. S. Fitzgerald, his wife and daughter, all were commonwealth witnesses.

Their testimony as to the shooting is that they and Sol Jackson were sitting in the Fitzgerald car about 75 or 100 yards distant from the scene of the difficulty.

Mrs. Fitzgerald testifies that upon hearing a shot, she looked up and saw the accused and the deceased engaged close together in a scuffle upon the railroad track; that she saw two or three shots fired by the accused Dean at Napier, as he stood three or four feet away, when she heard him holler, "O Lord, I am shot," and, withdrawing, attempted to go to a tool house standing close by the railroad track. Her daughter, Florence Fitzgerald, testifies substantially to the same effect. Further, they testify that Dean, after shooting Napier, turned and walked up the railroad track, and that as he passed them, they saw that his shirt and overalls were bloody.

H. S. Fitzgerald, the husband of the first witness, testifies that he also did not see the beginning of the trouble; that he was at the time sitting on Leslie Carroll's porch, in front of which his wife and daughter had stopped their car; that the first he saw of the encounter was when the accused and the deceased were coming from behind a small tool house, near the tipple and place of this shooting, and that he at first thought they were a couple of drunk fellows "scuffling along" as they went up the railroad track; that, after going about

100 feet up the track, "still scuffling along" as they went, he saw the accused reach to his hip and get his pistol and shoot Napier.

None of these three witnesses say that they at such time saw a knife in the deceased's hands or heard anything that was said by the combatants, as the distance between them and the combatants was too great.

Fitzgerald further testifies that immediately after the shooting, he ran over to the tool house, to where Napier had walked from the track and fallen, and found him "getting his last breath"; that he said nothing, but died, clutching in his right hand an open knife with a bloody blade.

C. B. McClung, another commonwealth witness, testifies that at the time of the shooting, he was in the tipple tool house (near which the shooting occurred) and heard the shots fired, but didn't see any of the fighting nor go out of the house until after Napier had fallen dying in its doorway, when he went out and saw the accused standing around on the railroad track and that there was blood on him; that just before the shooting, Dean and Napier had been sitting together on a bench outside the tool house; that Napier had come there first and then been joined by Dean, possibly five minutes later, when one of them said, "Let's move up the road a little, it's too hot here," when they left together, and within three or five minutes thereafter he heard the shots; and that, when Napier fell into the doorway, he held an open knife in his hand.

It is also shown by the commonwealth witnesses, Tom Middleton, Haywood Farmer, and Cora Middleton, that the appellant Dean had expressed to them, shortly before this shooting, his intention to kill Napier. Tom Middleton testifies that he was talking with Dean about a week before the killing, when he told him that "he was going to kill Lee Napier, said he was looking for him, he talked about living with his wife, or something or other over there, and he said he wanted to die, and to kill Lee Napier before he died; said that a day or two before that he made him turn his pockets wrong side outwards, and that if he had had a knife he would have killed him."

Haywood Farmer testifies that on the day of and

about two hours before the killing, Dean had said that Napier had accused him of trying to steal his wife and had told Tom Craig and him, "If we said so [Napier was then lying on the store porch drunk], he would go around there and speak to him and stomp his teeth out."

Also, Cora Middleton testifies that the accused Dean was talking to her on the morning of this shooting, when they met at the Crummies Creek store, and that he told her he had to then take a girl home and come back "and said if anybody didn't like it, he had the difference, and pulled his coat back, and showed the bulk of a gun or something, and then he went in the store where Lee Napier's wife [Josie Gailey] was, and him and her pulled out and went toward her home."

Also, the witness Finley Dean testifies that he met the accused, Albert Dean, as he was leaving the scene of his fatal shooting of Lee Napier, when he gave him the gun with which he had shot Lee Napier, and said, "I got the guy [also referred to by him as 'the son of a bitch'] I have been looking for him two or three days"; that Dean was then on his way to the hospital, where he remained under treatment for his knife wounds for some eighteen days.

This was practically all of the commonwealth's evidence.

The defendant, on the other hand, although admitting that he had shot Napier upon the occasion in evidence, claims that he had been compelled to do so in self-defense, after Napier had then already cut him with his knife and was still striking at him with it. Also, Dean states that he and Napier had never had any trouble nor had he ever made any threats against Napier or had anything against him. He denies his charged intimacy with Napier's wife, and explains his living at her home by stating that her brother was his friend and had helped him obtain his job with the coal company, and that that was the reason he afterwards stayed at her father's home.

The testimony of Sol Jackson, also a witness for the defendant and who states he is not a relative of any of the parties involved nor has he any interest in the outcome of the trial, corroborates Dean's account of the

facts and circumstances leading up to the shooting. He testifies that he saw the fight between these parties and that Dean was in front of Napier and the latter was hitting at him with a knife; that he saw Napier grab Dean by the arm and strike at him at least three times; and that Dean then backed off and drew his gun and shot him.

Jesse Goodman testifies for the defendant that he saw Napier following Dean, with his knife out, when Dean fired.

Dr. Rowland testifies for the defendant that he was called to see Napier and upon his arrival found him dead; that he saw the knife with blood on its blade before it was taken from Napier's hand; that he examined Napier's wound; and that his judgment was that it was immediately fatal and that Napier could not have cut Dean after it was received.

The appellant contends that an analysis and evaluation of all this evidence presents but the one question of whether the alleged verdict, finding him guilty of voluntary manslaughter and imposing a sentence of twenty-one years' imprisonment, is excessive. He contends that it is excessive, in that it is based only upon these threats, which he testifies are wholly false, and that it should not be permitted to stand.

The jury, under the instructions of the court and upon this evidence, having returned a verdict finding defendant guilty of voluntary manslaughter, and appellant's motion and grounds for a new trial having been overruled, the appellant prosecutes this appeal, insistently contending therefor upon the ground that "the verdict is excessive and contrary to the law and evidence."

In view of this insistence upon the insufficiency of the evidence to sustain the verdict, we have deemed it needful to set out hereinabove with some fullness the challenged testimony upon which the verdict is based. We will now consider appellant's contention that it is so lacking in the quality of proof as to render the verdict the result of passion and prejudice.

Prior to the Acts of 1910, c. 92, amendatory of section 281 of the Criminal Code of Practice, this court was without authority to review the rulings of a trial

court on a motion for a new trial; but since, we have constantly held that, if the verdict is palpably against the evidence, a reversal for refusing to grant a new trial should be directed. See Day v. Commonwealth, 197 Ky. 730, 247 S. W. 951, 953, and the cases therein cited as so holding. Also, under subsection 5, sec. 271, Criminal Code of Practice, it is the duty of a trial court to grant the defendant a new trial if the verdict be flagrantly against the law or evidence. In the Day Case, supra, it is further said:

"The rule that requires a submission of a case to a jury where there is any evidence, however slight, tending to show the guilt of the accused, must not be confused with the rule that requires the court to set aside a verdict of conviction if it be palpably against the evidence. Each has its distinct place, and there may be a proper application of each in the same case. One is as binding on the court as the other."

Appellant has invoked on this appeal his right to protection against the verdict on the ground that it is palpably against the evidence.

Applying these well-settled legal principles to our consideration of the evidence here before us, we may concede that were it confined only to the testimony of the commonwealth witnesses, the Fitzgeralds and Mc-Clung (who undertake to describe the fight or such part of it as they saw, but as to which they testify they did not see the beginning or who of the two was the aggressor in it; but only testify to the action of the parties, after their attention was called to it by hearing the first of the shots fired, when they looked and saw these parties at such stage of their scuffle, engaged at close quarters, wherein the deceased was striking at the appellant, when the latter drew back and fired the fatal shots at Napier, immediately after which Napier was found in the tool house doorway clutching a bloody knife in his right hand and Dean was discovered walking away in a bloody and wounded condition from knife cuts), even though Dean admits having so then shot and killed the deceased in his alleged self-defense, the verdict finding the defendant guilty of voluntary manslaughter is flagrantly against the evidence, in that the rule is that if from all the facts and circumstances there was an apparent necessity for the accused taking the

life of his antagonist in order to preserve himself from death or great bodily harm, then about to be inflicted, he is justified on the ground of self-defense; and a killing with a deadly weapon will be excusable when done in apparent necessary self-defense, or may be manslaughter when done in sudden heat and passion. Farris v. Commonwealth, 14 Bush, 362, 370.

The appellant was here charged with the murder of Napier, and as to which, upon the evidence here introduced, the court rightly gave also a voluntary manslaughter instruction, as for an offense included in the indictment, whereby it instructed the jury that if they should believe from this evidence heard, etc., that the defendant, in sudden heat and passion, or in sudden affray, upon a provocation reasonably calculated to excite the passions of the defendant beyond the power of his control, and without previous malice, did unlawfully, willfully, and feloniously so shoot and wound. the deceased with a pistol, as that he (Lee Napier) died thereby, they should find the defendant guilty of voluntary manslaughter.

The offense of "voluntary manslaughter" is defined as "the unlawful, willful, and felonious killing, without previous malice, of another, in a sudden affray or in sudden heat and passion, not in the necessary or apparently necessary self-defense of the slayer." Commonwealth v. Mosser, 133 Ky. 609, 118 S. W. 915. That is, "an unlawful, willful, and felonious killing without malice, or in sudden affray, heat, and passion, and not in self-defense, constitutes 'voluntary manslaughter.' " Arnett v. Commonwealth, 137 Ky. 270, 125 S. W. 700.

However, against the contention of the commonwealth that appellant was shown by its evidence to be guilty of this crime, the testimony of the appellant and his witnesses was that appellant, during this encounter with the deceased, did not attack the deceased or did not. draw his gun to shoot or shoot the deceased until after Napier had taken hold of him and cut him with a knife; that he was still in the act of striking and stabbing at him with it when, believing that his life was in danger from the attack, he drew his gun and shot and killed his. assailant in self-defense.

Against this defensive theory and evidence of the appellant, however, is the further testimony of threats.

given by the commonwealth witnesses, the Middletons and Farmer, as recited supra, who testify as to threats communicated to them by the appellant but a short while before his shooting of the deceased—that he stated he was going to kill Napier on account of the latter's having accused him of taking his wife—and also the testimony of Finlay Dean, to the effect that after the killing, he had met the appellant, who told him that he had killed "the son of a bitch" for whom he had been looking for two or three days.

In Evans v. Commonwealth, 221 Ky. 648, 299 S. W. 553, 555, the rule as to the admissibility of evidence of this nature is stated as follows:

"Previous threats, made by one charged with murder, against the person he is charged with having murdered are never admitted as substantive evidence that he committed the acts constituting the crime. Threats are admitted in evidence only as being competent on the question of malice, or on the question who was the aggressor, if the homicide occurred in a rencounter."

Further, the court in that opinion quoted with approval the rule announced in Daniel v. Commonwealth, 170 Ky. 693, 186 S. W. 489, which is as follows:

"In the prosecution of one accused of a homicide, it is always competent to prove any threat of violence made by the accused against the deceased, because it is competent evidence to be considered in determining whether the slaying was done with malice, and in cases where homicides have occurred as the result of rencounters, to assist the court in determining which party brought on the rencounter. The threats proved, as made by the appellant, in the case at bar, if true would be evidence tending to show the state of his mind as regards the deceased, and of a motive for the perpetration of the crime."

Certainly under this rule the evidence as to the making of these threats was competent, especially as conducing to show the appellant's state of mind towards the deceased and his motive prompting him to attack and kill Napier, the latter of which appellant admits. The testimony as to these threats having been made constitutes some evidence tending to show that

Dean, so motivated, brought on the encounter; or, that is to say, the testimony as to these threats is admissible and pertinent, as tending to show that Dean, after having declared he was going to kill Napier, did proceed to go to the scene of the difficulty, looking for Napier, where he found him and shot and killed him. If such was his purpose, as declared in his communicated threats, in seeking out Napier, it becomes an important link in the evidence, as showing that, pursuant to such plan disclosed by the threats, he began the difficulty which resulted in his killing of Napier.

The evidence is thus, by the threats testified to, made decidedly conflicting as to who was the aggressor in this fight, resulting in appellant's admitted killing of the deceased.

The evidence on this material issue being thus contradictory and conflicting, it became the problem for the jury's solution, leaving to their determination the credibility of the witnesses and the weight to be given their testimony. The court will not regard only the testimony of the accused and reverse on the ground of insufficiency of evidence. Hopper v. Commonwealth, 250 Ky. 405, 63 S. W. (2d) 467; American Mutual Liability Insurance Co. v. Hartman, 254 Ky. 712, 72 S. W. (2d) 429; Barney v. Commonwealth, 258 Ky. 432, 80 S. W. (2d) 513. Further, it is a familiar rule that this court will not disturb the verdict of a jury on facts unless it is palpably against the evidence. Meek v. Commonwealth, 249 Ky. 134, 60 S. W. (2d) 360; Jones v. Commonwealth, 250 Ky. 217, 62 S. W. (2d) 56; Barney v. Commonwealth, supra. Nor, as was said in Maggard v. Commonwealth, 257 Ky. 414, 78 S. W. (2d) 315, will the evidence in a criminal case be reviewed by the court to see if it justifies a conviction.

Controlled by these well-settled rules, we are constrained to hold that the verdict, being thus supported by the jury's appraisement of this conflicting evidence, which we are not prepared to regard as palpably and flagrantly against its verdict and further, it not being our proper province to determine whether the evidence justifies the verdict, we conclude that the judgment should be, and it is, affirmed.