# Smiddy v. Commonwealth.

(Decided June 4, 1937.)

WM. ROSE and C. B. UPTON for appellant.

HUBERT MEREDITH, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Between 10 and 11 o'clock p. m. on October 7, 1936, the wife of appellant, Ben Smiddy, was killed in Whitley county by the discharge of a load from a single-barreled breech-loading shotgun that was at the time in the hands of appellant. He was later indicted by the Whitley county grand jury, accused of murdering her by shooting her with malice aforethought, from the effects of which she died. At his trial he was convicted and punished by confinement in the penitentiary for his life. His motion for a new trial was overruled, and from the verdict and the judgment pronounced thereon he prosecutes this appeal, urging through his counsel a number of grounds as alleged errors entitling him to a reversal of the judgment. However, we do not deem it necessary to devote any part of this opinion to a con-

sideration of any of them, except these: **(1)** That the evidence was and is insufficient to sustain the verdict, and for which reason the peremptory instruction of acquittal offered by appellant and refused by the court should have 'been given; or, if not so, then that the murder verdict is flagrantly against the evidence; (2) that the court erred in permitting the jury to take with them upon retiring for a consideration of their verdict the gun with which the killing was done; and (3) newly discovered evidence.

Other grounds, not enumerated, related to the erroneous admission of testimony offered by the Commonwealth, the rejection of competent testimony offered by defendant, and the giving to the jury of instruction No. 1, which was the one on murder. But counsel in their brief point out no error in the admission or rejection of testimony, and our diligent and painstaking reading of the record has failed to reveal any ruling of the court to which objections and exceptions were made in support of such grounds, nor were any of them prejudicial. Likewise the complaint of the action of the court in giving the murder instruction is based upon the same contention made in ground 1, supra; i. e., that the evidence was insufficient to authorize the murder instruction. A disposition of the three grounds, as numbered above, will dispose of all of the complaints urged and relied on by counsel in behalf of their client. We will consider them in the order enumerated.

1. The determination of ground 1 calls for a sufficient statement of the facts adduced at the trial as may be necessary to determine the contention therein made. It is not shown how long the couple had been married prior to the time of the death of the wife. But enough appears to show that they had not been recently married, and we infer that their marriage was, perhaps, as much as or more than five years prior to that time. They had no children, so far as the record discloses, and at the time of the killing they resided in a suburban territory to the town of Jellico, a part of which is located in Whitley county, Ky., and the remaining portion in contiguous Tennessee territory.

'At about 5:30 p. m. on the fatal day, the couple left their home, after eating an early evening meal, and went to the home of appellant's brother, Dave Smiddy,

which was located somewhere within the corporate limits of the Kentucky portion of Jellico. On the way from their home to that place they stopped and rested on the side of the road, when some man appeared and delivered to Mrs. Smiddy a paper and which appellant said was a subpœna for his wife to appear as a witness in some trial the next day in the county seat of Williamsburg. It appears that she had failed to respond to a former one, and the stranger officer, who delivered to her the subpœna while the couple were resting, was informed by Mrs. Smiddy that she had not attended, and possibly could not, because she had no shoes, whereupon the officer delivered to her $2 with which to obtain a pair. The couple then went to the home of appellant's brother, and when they arrived she went into his home where his wife and some other women had gathered, while appellant repaired to a nearby garage and entertained himself playing seven-up for some considerable time. We also gather that he and his companions indulged in imbibing in intoxicating liquor to some extent, as did also his wife and the other female occupants of his brother's residence while he was away. Some short while after his departure from the garage and his return to his brother's residence, the couple concluded to return home, and Margaret Smiddy, an eleven year old daughter of Dave Smiddy, and consequently appellant's niece, asked and obtained her mother's consent to go home with appellant and his wife and spend the night at their home.

In the meantime the deceased had purchased a pair of shoes and likewise some steak and a loaf of bread. When the parties left the brother's house for their home, the niece carried those packages of merchandise, whilst the wife started out with a gun. Directly after they left the house they concluded to go by the residence of a Mr. White, who had married a sister of appellant, and where the brother, Dave Smiddy, then was, in a drunken condition. The purpose assigned for going to the residence of Mr. White was to obtain the pocketbook of the intoxicated brother, Dave, so as to prevent possible robbery or loss of it while he was in the then known intoxicated condition. On the way to the White residence, appellant took the gun and it was in his possession until they arrived at White's residence. The two, i. e., appellant and deceased, jointly placed the gun under the porch to the White residence,

and the three travelers then entered it. They tarried there some thirty minutes or more, the hour then being near 10 o'clock when they concluded to take up their journey to appellant's home. Both the deceased and appellant jointly engaged in taking the gun from under the porch where both of them had in like manner placed it; but appellant took it, and the three, including the niece, started to appellant's home. However, just as they left the porch after obtaining the gun, they concluded that it was so dark that they needed a light, and Mr. White furnished them a miner's carbide lamp. They had gotten only about a hundred feet, or possibly less, from the White residence, traveling, as we gather, a more or less dubious path, when, according to the testimony of the eleven year old niece, appellant, who was carrying both the light and the gun, turned around, threw the light upon the deceased, and said, "Who is it?" to which she replied, "Nobody." Witness was then asked: "Then what was done? A. And he pushed at her with the gun, just like that [indicating]." She then identified the gun which was produced at the trial as being the one to which she referred. The prosecuting attorney then had her to demonstrate just how the gun was held and handled. She stated that deceased picked up two rocks out of the path they were traveling "and just pitched them like that [illustrating]." She then stated that the parties were then about four or five feet apart, and that she did not know whether deceased hit appellant with the rocks or not, although they were thrown towards him. She was then asked: "And then immediately after she had drawn her second rock, or pitched it, however it was, what did Ben [appellant] do?" To which she answered: "She grabbed hold of the barrel of the gun." The prosecutor then had her demonstrate again the exact position that appellant held the gun when his wife grabbed its muzzle, after it was pointed at her close enough for her to reach it. She then told about the gun firing and deceased falling to the ground and instantly dying. The load entered just above the right nipple and went straight through. None of the numerous witnesses who saw the deceased after she was killed discovered any powder burn on any of her clothing, or on her body, although a witness for appellant testified that there were some bluish looking spots near the entrance of the load into the body of deceased.

She did not pretend, however, to say that they were powder burns, and it could not well have been so, since the clothing of the deceased would have prevented her flesh from showing any such consequence.

Later in the night the coroner summoned a jury and held an inquest. He and one or two of the jurors testified that appellant was sworn as a witness and testified, stating that he said his wife shot herself, and that "she had been threatening it for about six months," and that she pulled the gun off and shot herself, and then hugged him and kissed him and started to fall and he laid her down on the ground. That officer, with a number of other witnesses, testified that they made a close inspection for powder burns and none were found. The coroner also testified that he asked appellant about who was present at the shooting besides himself, and witness said: "He stated his brother, but immediately changed it and said 'my nephew—my niece was present, little girl, niece eleven years old.'" It was shown that on the way from Dave Smiddy's house to the White residence the deceased handed to appellant two cartridges that would fit the gun, and described in the testimony as being loaded with a very highly explosive powder.

Appellant, in his testimony, gave a history of the prior events to which we have referred, but with perhaps more detail, and in describing what happened at the immediate time of the shooting he testified:

"She reached me the light, and they was some hogs or something scrambling around up there. I don't know what it was, and I said something about, 'What made that noise or racket or something,' and Mildred [deceased] said, 'That wasn't nothing unless it is them old dogs,' and picked up a little old gravel or two. I don't think she picked up but one though and pitched it off down that way [illustrating], and I just turned around like this, turned the light around, turned myself around following the path we was going, and when she grabbed the gun she jerked it.

"Q. 80. What happened? A. When she jerked it, it went off. As fur as wrestling or scuffling over the gun, there wasn't any scuffling to it. She just grabbed the gun like that [illustrating], and jerked and when she jerked the gun it went off."

He then testified that he did not have his finger upon the trigger of the gun but only his clenched fist in front of the trigger guard; that he had not cocked the gun, nor did he know that it was loaded; and that he never, intentionally or otherwise, caused the gun to fire. However, the Commonwealth's attorney, in cross-examining him, had him to illustrate how he was holding the gun at the time it discharged its load; how close the muzzle was to his wife and how she was holding to the gun. He was later asked what caused the gun to fire and said that he did not know, unless it was the jerk that his wife gave it, although he also testified that the jerk that she did give did not cause the gun to slip through the grasp of his hands with which he held it. There were some other slightly material facts appearing in the testimony, tending to show that the firing of the gun did not occur as appellant described it in his testimony; but the materiality of that testimony was more or less remote.

With the testimony in the condition as we have described it, appellant vigorously contends that it was insufficient to submit the murder charge to the jury, although he concedes that, possibly, his client was guilty of voluntary manslaughter committed through reckless handling of the gun, since it will be remembered that he was the one who pointed the gun at his deceased wife immediately following her throwing of the rocks which the infant witness said was toward appellant. Likewise, it will be remembered that appellant was the only one who detected the happening of anything on that occasion to interrupt or disturb the journey from the White residence to appellant's home that the parties were then making. Neither did he state that he ever discovered any animal or any other producing cause for any such disturbance, if there were any, and which has this importance, that it was the disturbance, which he stated occurred, that caused him to turn around and throw his light upon the body of his wife and to then present the muzzle of the gun toward and close to her body after she threw the first rock or rocks. Likewise, it will be remembered that the coroner, and two or three of the inquest jurors, stated that appellant testified at that hearing that his wife shot herself, and that she had been threatening to commit suicide for some six months or more. It is true that he denied that statement in rebuttal, and explained that

what he meant when he said that his wife had shot herself was that she had jerked the gun and thereby caused it to fire at the crucial moment when the load would enter the vital part of her body.

It was shown on behalf of appellant that he and his wife were considerably attached to each other and that they had been engaged in no quarrels theretofore; but it was proven by appellant himself that he had served a felony term in the penitentiary.

Counsel for appellant cite a number of cases wherein we held the evidence insufficient to authorize a conviction, or where we held that the verdict of conviction was flagrantly against the evidence—all of which we have examined. In each of them the testimony all harmonized with the theory that the accused was innocent of the offense for which he had been convicted. In arriving at that conclusion in those cases, we discovered nothing in the record supporting a contrary view, i. e., they contained no circumstances pointing to the guilt of the convicted appellant, nor did his relation of the facts, in giving his testimony, radically or otherwise depart from facts gained by human observation and experience. We do not find the evidence in this case in that condition. That appellant pointed the gun at his wife, and, perhaps, punched her body with its muzzle, is uncontradictedly established—even admitted by him. That his deceased wife for some cause saw proper to pick up some rocks and throw at least one of them toward, or at him, is likewise true. The somewhat illusory reason why appellant interrupted the journey to his home by professing to hear something that he was unable to describe, and which he never discovered, is also entitled to some consideration. There is some slight contention as to who should obtain the gun from under the porch when the trio left the White residence to go to appellant's home. In addition to all of which is the fact that appellant first stated to the coroner that his brother was present, then that his nephew was present, and lastly that his niece was present at the shooting, which, he also said, was done by the deceased, and that she had threatened to commit suicide for at least six months prior to her death.

With the record in that condition, we do not think the court erred in overruling appellant's motion for a peremptory instruction, nor are we able to say that the

verdict convicting him of murder was flagrantly against the evidence, although the testimony on that issue is not of the unerring type. It is argued that no motive appears for that degree of homicide; however, it should be remembered that the necessary condition of mind to make the producer of homicide guilty of murder, i. e., malice aforethought, is universally defined to be "the predetermination to do the act of killing without just cause or legal excuse, and it is immaterial how *recently* or how *suddenly* before such killing such determination was formed." The trial court properly so defined "malice aforethought" in an instruction it gave the jury. It found the required premeditation, which may have been generated from some one or more of the occurrences that happened on the fatal night either before or after the parties left the White residence—even at the place where the killing occurred.

The argument of counsel proceeds upon the theory that courts are required to accept literally the testimony of their client unless overcome by credible contradictory express testimony; but which is done to a more or less extent by the testimony of appellant's infant niece. However, the theory itself is clearly unsustainable, as is shown by constantly applied and approved practice. No rule is better settled than the one holding that a fact may be completely established by circumstantial evidence alone, and the cases are numerous and occupy a large space in volumes containing appellate court opinions wherein express testimony has been set aside and disregarded because overcome by the indisputable circumstances developed. Here, as we have seen, the deceased had her hands nowhere in the neighborhood of the trigger of the gun that produced her death. The appellant did have his hands so adjusted that he could easily manipulate the trigger as well as cock the hammer. No one says or intimates that the gun was cocked when he last obtained possession of it. No natural or convincing reason is advanced by him for pointing the gun *at* his wife and holding it in such a position as to cause her to grab its muzzle; while an equally potent fact is that the gun was raised to a point near to or resting against appellant's shoulder when it fired, and the barrel was in a longitudinal position so as to make the load go straight through the body of the unfortunate victim. Such circumstances, with other less convincing ones, produced a situation

creating a submittable case, and also one where a verdict disregarding appellant's express testimony cannot be characterized as flagrantly against the evidence. The law places a high estimate on human life, and no one is permitted to destroy it, except in certain prescribed cases, and when he admits guilt of homicide he should not escape the penalty therefor without convincing the tribunal passing upon his case that his deed was excusable under such limitations. We therefore conclude that ground 1 cannot be sustained, although it may not be amiss to say that had we been a member of the jury we would not have agreed to a verdict for the highest degree of the offense without some hesitation.

2. Ground 2 is entirely without merit, since it was shown, without contradiction, that appellant's counsel, in his argument to the jury, expressed the hope, as well as the wish, that they would take the gun with them to the jury room when the case was submitted to them, and that counsel was present when they did so. In the circumstances, it is therefore clear that the error, if one, was waived and cannot now be relied upon, and which dispenses with the necessity of our determining whether or not the action of the jury in so doing was proper or improper.

3. The alleged newly discovered evidence was the affidavit of the sheriff and some other witnesses who stated that after the conviction of appellant they took the gun and fired it several times and discovered that "the hammer would explode the cartridge containing the load" without pulling or touching the *trigger* thereof (not hammer) by pulling the hammer back to a point just before it was fully cocked and releasing said hammer," and that thereby the gun might be caused to fire without touching the trigger; that the "shots were fired from said gun without touching the *trigger* and by merely pulling the hammer back and *letting same slip,*" whereby the loaded cartridge was caused to explode. Appellant, in his affidavit, names his newly discovered witnesses and what they would testify, and also himself states the same facts. But if true, then the test made by those witnesses, according to our view, demonstrated nothing that threw any light on how the gun may have been caused to fire at the time decedent was killed, since every one knows that any gun with a sufficiently strong spring will explode the cartridge when the ham-

mer is drawn back near to the clicking point and then loosened, so as to cause it to fall. Moreover, the gun was present throughout the trial, the contention of accidental shooting happening in the manner appellant described was appellant's sole defense, and his counsel, as the evidence discloses, handled the gun during the examination of some of the witnesses. In the circumstances it would require a long stretch of the applicable rule to say that the conditions described by the newly discovered witnesses could not have been discovered by the exercise of ordinary care, even if the discovered fact was material, which, as we have pointed out, we regard as untrue.

Perceiving no error authorizing a reversal of the judgment, it is affirmed.