## Woods v. Commonwealth.

April 19, 1940.

S. M. Ward, Judge.

C. R. Luker, S. E. Duff and L. D. Lewis for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

The grand jury of Leslie County on March 22, 1939, returned a true bill charging appellant and another with the murder of Graydon Morgan. The offense was committed about noon on Sunday, January 22, 1939.

The case was called for trial on April 5, 1939, and upon the commonwealth's motion severance was ordered, the commonwealth electing to try appellant. By agreement of parties a jury was to be procured from another county, and by order of court a special bailiff summoned fifty persons qualified for jury service from a nearby county.

The jury found the accused guilty of murder, fixing his punishment at confinement for life. In support of an overruled motion for new trial, appellant set up twelve or more grounds, seven or eight of which are urged here in asking reversal of a judgment entered in accord with the verdict. While the point is not directly made that the verdict was contrary to the evidence, it comes into the argument in discussing one of the instructions given by the court, thus necessitating a brief summary of the proof.

At the time of the homicide appellant was deputy jailer. He had for ten years served a part of that time as deputy jailer, and sometimes deputy sheriff. The record bears out the statement in brief that he was a faithful and fearless officer. His son was not an officer at the time of the homicide, though it appears that when the trouble started which led up to the homicide, he was deputized (verbally) to aid his father in making an arrest

It appears from the record that appellant and deceased, who were related, were on friendly terms; at least there was no particular evidence of bad feeling between the two, though in the brief for appellant it is said in substance that certain political alignments

caused an unfriendliness between the sheriff and the jailer and his deputies; a hint as factional differences.

Appellant lived in or near the town of Hyden. On the day of the homicide he had eaten his dinner and returned to the court house, where two of his sons and several friends were sitting in the county judge's office, from which they could observe people on the street in front of or at the side of the court house. Near the court house, at a corner of the yard across the street, Ed Mattingly operated a garage, and in connection therewith a restaurant. On another corner and nearer to the jail, lived Tom Deaton.

Appellant noted considerable activity and movement on the part of several persons, among whom were Mattingly and his wife; Lyons and his wife, and Deaton and his wife. Deceased was not among those who made the numerous trips from the Deaton home to the garage, and vice versa. Appellant says he had observed some unbecoming conduct on the part of the travelers. Observing later that Lyons and his wife and Oma Mattingly went into Deaton's home, staggering drunk, he made preparations to arrest them on their reappearance.

Appellant, accompanied by his son, upon the reappearance of the women, approached them and told them they were drunk. Appellant says: "I commanded their arrest and told them he would have to take them to jail." He saw a half-pint bottle in Oma's coat pocket; removed it, and found it to be half full of "moonshine." He again told her he would have to put her in jail, and she remonstrated, saying, "I will not go to jail." Appellant then took hold of her and started toward the jail, she still resisting. About this time some one went into the Deaton home, apparently giving information as to the arrest, and, at once, Tom Deaton and Lyons ran out of the Deaton home, one or the other carrying two pistols. There was some scuffle over the pistols, but when they "broke loose" each had a pistol and Deaton said to appellant, "You s. o. b. turn that woman loose," and threw up a 45 and fired at appellant. The shot came close to him, not taking effect, though he says he fell to his knees.

At this point the son fired at Deaton, the shot took effect and apparently killed him instantly. Lyons, who

had come out of the Deaton home, ran behind some lumber nearby, and opened fire on the son, and there were several shots exchanged between them. Lyons then turned his gun toward appellant, when a deputy sheriff appeared on the scene, and took Lyons' pistol and placed him under arrest. Just at this stage Morgan appeared on the scene; ran toward appellant and said, "What in the hell is going on here?" Appellant wheeled around and saw Morgan approaching; grabbing at him, appellant telling him to keep back, but he kept coming and grabbing with one hand, the other down by his side. Appellant fired one shot which took effect, Morgan sinking to the ground.

The foregoing is taken chiefly from the testimony of appellant, and is corroborated by his son, and to some extent by eye witnesses to some, if not all of the occurrences.

For the commonwealth, the wife of deceased said that on Sunday morning she and deceased had gone up to a saw mill to get some "two by fours," and were returning home. They stopped for a while at the home of relatives. He left for the purpose of getting a shave, but did not return for dinner. The wife shortly after noon went out and found him at the garage. They were just preparing to get into a truck to go home when the wife heard someone crying, and said, "Let's stop and see who it is." She and Morgan then walked toward the scene of the difficulty, and when they got near Morgan said:

"Henry what's the trouble out here?; Henry had his back to the court house; he heard his voice and looked around and seen us standing there, and he just turned around and fired, like that. When Henry went to shoot him, he said, 'Lord have mercy Henry don't kill me.' He went to sinking and looked up and said, 'What did Henry shoot me for?' "

She says that when the shot was fired, Morgan had his hands up. Morgan was taken to the hospital at once, where an operation was performed, but he died about noon the following day.

Oma Mattingly testified that on Sunday morning she worked at the garage a while and then went to Sunday School, leaving there about eleven o'clock, return-

ing to the garage. She was positive in her assertion that she had not drunk any liquor that morning, and had none on her person. She went home with Mrs. Deaton to assist in preparing dinner. She had talks with Clifford Lyons and his wife. She and Mrs. Deaton went over to the garage to get drinking water, and "ask the men to come to dinner." The two men and women then started to the Deaton home, and the two women turned to go to the garage for a loaf of bread which they had bought and left there.

Just at this point she said appellant and his son called to them, and they looked back, but went on not thinking that they were being called. They kept walking, and appellant grabbed witness, and the son took hold of her companion. They started toward the jail, and the son turned his prisoner lose and fired at Deaton, killing him. She says appellant then threw his gun on her husband, Ed Mattingly, and she grabbed both his hands, and the pistol fired. Appellant and witness struggled some time over the pistol, and in the struggle she says he struck her and knocked her down. She says just about this time Morgan came up back of her and said: "Lord have mercy, don't do that, and Henry throwed his gun around and Gradon staggered back." She says Morgan never at any time took hold of appellant.

Another witness, who was in the melee, said that when Morgan came up appellant had his pistol pointed at witness, but turned and fired at Morgan, who at the time had his hands up. He and other witnesses, one a deputy sheriff, estimated the distance between appellant and Morgan at the time the shot was fired, to be from 5 to 10 steps. Some of them tell of the words used by Morgan as he came up, though do not entirely agree. They do agree, however, that Morgan had no weapon, and when he was shot had his hands up, begging appellant not to shoot, or not "to kill anybody else."

We need not give any further details of the evidence, but merely say that the testimony of the commonwealth, above recited, was corroborated, and that the weight of the evidence shows Oma Mattingly was not drunk on the occasion.

It is first contended that the court erred in overruling demurrer to the indictment, but counsel points to

no particular reason why, and we can find none. The record does not show that demurrer was interposed. Inspection shows that it alleged the commission of a public offense, and was to all intents and purposes in conformity to law. It is stated in brief that the indictment did not carry the names of witnesses appearing before the grand jury, as required by Section 120 of the Criminal Code of Practice, and it is contended that this omission was fatal.

It is true that the names did not appear as required, but the transcript fails to show that the defect was called to the attention of the court, even on motion for a new trial. In the absence of a motion to quash or set aside the indictment, the objection is treated as waived. Criminal Code of Practice, Section 157; Ridings v. Com., 245 Ky. 22, 53 S. W. (2d) 190; Sloan v. Com., 211 Ky. 318, 277 S. W. 488, and cited cases.

Contention No. 2 is that the court erred in refusing to sustain his motion for a continuance. The record shows that the homicide was committed in January. The indictment returned in March, and trial was begun on April 6th. It is stated in the affidavits that the two accused surrendered to officers on the day of the homicide, and were taken to a jail in another county, where they remained for eight or nine days; their examining trial was then had, and both were allowed bail. They then went to their home, but due to the attitude of persons interested in their prosecution they did not visit Hyden until the first day of the March term of court. On this day the mother of the deceased and Cliff Lyons undertook to shoot them, and they returned home, and did not return to Hyden until April 4, the day before the trial, and then under escort of officers.

Appellant's contention is that due to the circumstances related, he did not have reasonable opportunity to see, talk to or procure but few of the many "vital eyewitnesses" necessary in their defense, "but from what accused understood, such witnesses will testify to material facts necessary to their defense." It was said that the mother of appellant had been ill since the 20th of March; had later died and was buried on April 4, and that this circumstance "coupled with the other facts set out" prevented them from consulting with counsel or to prepare their defense properly.

The affidavit also set out that their chief counsel, Judge Lewis, with whom they had consulted, due to illness was unable to go through the trial. The attorney mentioned, recited that he had been ill for some time, and his physician had advised him to remain at home, though in spite thereof he was present in court.

If the case, which we are considering, had been one of any real complication, there might be merit in the contention, but it was not such; the defense was simple and easy of preparation. The accused had been an officer, connected with the court for more than ten years. He, perhaps, was well acquainted with every person who saw any part of the proceedings which led up to the homicide. There is no doubt, as we read the record, that accused had as many friends as did the other hinted at faction. The fact that he and his son thought it best not to visit the nearby town would not prevent his friends and his counsel from visiting them.

The affidavit, in so far as it undertakes to state reasons for non-preparation of defense, does not impress us to any favorable extent. There is a lack of showing of diligence, or effort toward diligence. There was no showing in the affidavit what witnesses might be procured if time be given, or would if present, "testify to material facts necessary to his defense."

Appellant was represented by able counsel. One of them, as our records show, had served his district as commonwealth's attorney, and who was skilled in the preparation and trial of criminal cases. Neither of the two assisting counsel are heard to say that there was lack of opportunity for preparation. The facts and circumstances related here do not measure up to those recited in Johnston v. Com., 276 Ky. 615, 124 S. W. (2d) 1035, and relied upon, which we reversed, because of error in refusing a continuance.

A third ground is that the court erred in sending to another county for veniremen, and it is argued that there was prejudicial error in sending one Johnson, special bailiff, a relative of Tom Deaton's, to Laurel County for the summoning of prospective jurors. There is no showing as to how appellant was prejudiced by being tried by a jury from another county. As we read affidavits for continuance, the court would have been justified in so procuring a jury, or if motion to do so had

been made, in changing the venue. However, appellant is precluded from complaining on the first point, since the attorney for the commonwealth and the defendant agreed that "an order should be entered directing the summoning of a jury from another county to try these cases, except Perry County."

As to the bailiff, the argument is that at the time he was appointed appellant did not know that the bailiff was related to Tom Deaton. It is not asserted that the fact of undisclosed relationship caused the bailiff to summon any biased or prejudiced juror, or that the veniremen were selected in any unfair way. The affidavit merely stated that "Johnson is related to deceased Morgan and Mrs. Deaton;" that neither he nor his counsel had knowledge that Johnson was to be appointed as bailiff. It is to be noted that the order agreeing to summon jurors from Laurel County recites that Johnson was named, and he "being present accepted said appointment and took the oath of office." We do not find in the record any challenge to the panel, motion to set aside the swearing of, or to discharge the jury on the basis of illegal summoning or procuring the jury.

It is complained that in stating the case, employed counsel for commonwealth stated that accused and his son were secretly examining their pistols to see if they were properly loaded and in working order, just before they went out to arrest the two women. Also that in referring to Oma Mattingly, one of the arrested women, witness would say that appellant "jerked her down two or three times and when he done this his son Hamblin, that went to see whether he had six shells in his pistol went to the corner of the jail and laid his pistol up on the side of the jail for some little time."

It is contended that these statements as to what would be proven were prejudicial, since it developed later there was no proof bearing out these statements. There was proof that "another boy" who was in the melee had his pistol lying by the corner of the jail. There was proof that appellant knocked the Mattingly woman down, and he and she were scuffling over appellant's pistol. The latter statement was sufficiently borne out by the evidence. There is little or no evidence to bear out the statement that appellant and his son were,

prior to the arrest, examining their pistols, but we cannot see how the statement would work to the prejudice of appellant. They no doubt would not undertake to make an arrest, or anticipate trouble unless the pistols they were admittedly carrying were in working order. That they went out well armed would lead to an assumption that there might be some trouble in making the arrest.

There was an objection interposed by appellant to a statement made by counsel to the effect that it would be shown that:

> "Morgan died never knowing why this defendant took his life. We will show you that when he sank down there with his wife by his side, while he was lying there on the ground when the blood was trickling his life away, he said: 'There is no need moving me, just let me die where I am'; that he was killed and soon going into eternity; that he requested the people who were to go to Mr. Woods, not one, but a number of times before he died he wanted to know why he killed him."

The record shows that when objection was interposed, the court said: "You will not consider that statement for any purpose whatever, and not let it have any bearing on you." We are not called upon to determine whether or not, if this statement was of such effect that the mere admonition not to consider it, would altogether remove the poison, if any there was. But the statement was substantially borne out by admitted evidence, which will be considered later.

The closing argument is not contained in the record, but the bill of exceptions show that objections were made to the following statements:

> "The thing that's wrong with this country is bootleggers hiding behind a bunch of deputies. * * * You are going to have to find Oma Mattingly was drunk, if you don't write a verdict of murder."

> "I would like to see the hands, and people to stand up who knows she wasn't drunk."

The most we can say of this combination of statements is what we have said on other occasions as to

similar statements, that they were totally uncalled for, and without innuendo, meaningless. It is beyond the comprehension of this court to conceive how an attorney for the prosecution will so frequently make uncalled for and unnecessary statements in argument, which will or may be the ground upon which an otherwise errorless trial may be upset by reversal of a judgment. The jury was not interested in counsel's opinion as to what was wrong with the country. Nor did the jury care to see a showing of hands, or a rising vote, on the question as to whether Mrs. Mattingly was drunk or sober. They may well be assumed to have been sensible persons, and were to be guided in their deliberations by the proffered evidence. These statements do not constitute reversible error.

It is next argued that the court erred in sustaining the motion of commonwealth to sever. It is admitted by counsel that the court may in reasonable discretion permit the commonwealth to have separate trials where two or more are jointly indicted. Counsel fails altogether to point out to us wherein the court abused that vested discretion, or that appellant was prejudiced. Section 237 of the Criminal Code of Practice provides for severance on motion of a defendant jointly indicted, and we have held that as to an accused this provision is mandatory. In Drake v. Com., 214 Ky. 147, 282 S. W. 1066, citing the earlier case of Hoffman v. Com., 134 Ky. 726, 121 S. W. 690, we held that although the Code was silent as to the right of the commonwealth to a separate trial, it was, following the common law which had not been abrogated, a matter of discretion vested in the court. See, on this point, Martin v. Com., 269 Ky. 688, 108 S. W. (2d) 665.

It is next argued that the court improperly instructed the jury. The contention is that the court should not have given the instruction on murder, since the proof is not such as to justify an instruction on a higher degree than voluntary manslaughter, the taking of human life in sudden affray or sudden heat and passion. It is true as argued, that there was no showing of previous ill-feeling between accused and deceased. It is also true that Morgan appeared upon the scene suddenly and unexpectedly. But, as we read the testimony of the commonwealth, which the jury undoubtedly

believed to be true, there was made out a case calling for the murder instruction.

It is sometimes difficult to show malice, or previous malice; its existence may be inferred by the jury from all the facts and circumstances, and the jury may from these conclude that there was a predetermination to do the act of killing without legal excuse. It is in every case immaterial how recently or how suddenly before the killing such determination was formed. In the case before us, as we shall presently show, the excuse offered was one of self-defense. In other words, appellant determined to kill Morgan on sight, as he says, in order to protect his own life. The determination was formed before the shot was fired. He admitted firing the shot, and as we have said in many cases, when one "admits guilt of homicide he should not escape the penalty therefor without convincing the tribunal passing upon his case that his deed was excusable under such limitations." Smiddy v. Com., 269 Ky. 50, 106 S. W. (2d) 131, 135. A comparison of facts adduced in the above case with those before us, would lead us to the conclusion that the murder instruction was properly given.

It is also contended that instruction No. 5, given by the court, was erroneously framed. It does not appear to be the contention that the giving of an instruction on the rights and duties of an officer making an arrest and meeting with resistance, or the giving of No. 5, in the form given, prejudiced appellant's substantial rights. The fact is, as we read it, the instruction was much more favorable than appellant was entitled to have. The chief contention is that the instruction should have followed, substantially, the one laid down in Smith v. Com., 176 Ky. 466, 195 S. W. 811. We agree that this conclusion is true.

The instruction given made no reference to appellant's having been at the time a peace officer, with right to arrest for a misdemeanor committed in his presence, nor his right or duty to make an arrest under such circumstances. The instruction told the jury that if it was believed that "the deceased Morgan, did by force or violence attempt to prevent the arrest or to rescue Oma Mattingly from the custody of defendant, and if you shall believe from the evidence that the defendant believed in the exercise of a reasonable judgment that it

was necessary to shoot, wound or kill Morgan in order to repel and overcome the force or violence offered him, then you will find for the defendant.

The law as laid down in the Smith case, supra, and approved in Hatfield v. Com., 248 Ky. 573, 59 S. W. (2d) 540, 541, does not give an officer the absolute right to kill for the purpose of effecting an arrest, or in preventing escape after arrest. The rule is, with regard to one undertaking to escape arrest, when the offense is a misdemeanor, the officer may use such force as is necessary, or appears to him to be reasonably necessary, to overcome such forcible resistance, even to the taking of life. See also late cases of Johnson v. Com., 268 Ky. 555, 105 S. W. (2d) 641; Baker v. Com., 281 Ky. 45, 46, 134 S. W. (2d) 997. So, it will be seen here that the jury were not directed to consider the question as to whether or not the appellant could have prevented the claimed resistance with less force than taking his life, therefore the instruction was more favorable than prejudicial.

It was also favorable in that it may be doubted, but not necessarily decided, that under the proof appellant was not entitled to this instruction in addition to the instruction on his right to act in self-defense. We say this because as we read the record, at the time appellant shot Morgan the situation was such that it did not necessarily appear to Morgan that the Mattingly woman was under arrest. From the proof it appears that appellant had ceased his struggle with her and was several feet from her; also at this time Sizemore was importuning appellant to let him take the woman home. Again, it is shown from appellant's testimony that he did not say he shot Morgan because of any interference. Asked why he shot Morgan, he replied: "Because he got hold of me there and I was afraid he would kill me. He dropped his hand down to his side and I thought he might have a pistol in his hand." Again: "Do you mean to tell the jury that your friend came and grabbed you by the arm, and you with a pistol in your hand, you shot him?" "Yes, I was afraid he had a pistol. * * * I shot him, and was afraid not to shoot him; afraid he would kill me."

The last complaint is that the court erred in admitting certain alleged dying declarations of Morgan. De-

ceased was shot about noon on Sunday. The wound is not described with accuracy. The best we can make of it is that it was in some part of the abdomen, though the bullet did not go through the body. He was taken to the hospital after the shooting; had treatment and, perhaps, an exploratory operation. He died the following day at noon time. His mother was with him at the hospital shortly after Morgan was taken there, and statements made to her by the son are the subject of objection. We incorporate the testimony of the mother as given in the record:

"When we took him to the hospital and they had him behind the curtain the Doctor said I could go in, and he said, "Mammy I'm killed; Henry Woods shot me and I wasn't doing nothing to nobody." Objection not ruled upon.

By the Court: "Tell the jury all he said."

"He said he walked around there and just as soon as Henry seen him he throwed his gun on him and he throwed up his hands like that and said, 'Lord have mercy, don't shoot me, what's the trouble,' and what he shot him for he didn't know. 'I wasn't bothering anybody.' " Objection overruled.

Again: "He said when I first went to the hospital, 'Henry Woods shot me and killed me for nothing.' Said, 'I didn't bother nobody.' " Objection. By the Court: "You will not consider that statement."

Again: "He said he heard the shooting and everybody was going and he went and Henry throwed his gun on him and he said, 'Lord have mercy, don't shoot me, what's the trouble,' and 'he throwed his gun on me and fired.' He said, 'I'm killed and never bothered nobody.' "

Objection overruled to the last part of the answer.

It is also argued that certain other witnesses were permitted to testify that immediately after Morgan had fallen, and as he was being helped up, he said, more than once, "Why did he shoot me?" This, it is claimed, amounts in substance to the use of the words: "He shot me for nothing." The wife was permitted to say that as he was sinking to the ground, "He looked and said, 'what did Henry shoot me for,' and I said, 'I don't know.' "

The chief objection to the testimony of the mother is to that portion in which deceased had said, "Mammy I am killed; Henry Woods shot me, and I was not doing nothing to nobody," and later, "Henry Woods shot me for nothing."

We have here a double proposition. Some of the statements made and objected to were made within such a short time after the shooting, some within a few seconds, none remotely, as to bring this testimony within the res gestæ rule. Those made to the mother were shortly after Morgan was taken to the hospital. The interval of time is not shown, so the mother's statements must be viewed in the light of our rules as to competency of dying declarations. There is little complaint that such statements as are attributed to Morgan were not made in extremis. He told his mother he was killed. He told persons who were putting him in a car: "I can't walk any further; just let me die here. I am going to die anyway. I might as well die here." There can be no doubt that the statements made, on both occasions, were made under the belief of impending death, and were properly allowed to be introduced, if the substance thereof was not objectionable. In Reno v. Com., 258 Ky. 166, 79 S. W. (2d) 692, we held incompetent such expressions that defendant had shot declarant "for nothing," and that accused had "killed him for nothing," because they were merely expressions of opinion, and not statements of fact.

We note that the court sustained an objection to the statement of the mother that deceased had said: "When I first went to the hospital he said, 'Henry Woods shot me and killed me for nothing. I didn't bother anybody.'" The statements, "I wasn't bothering anybody," coupled with, "What he shot me for I don't know?" and "I wasn't doing nothing to anybody," are statements of fact, rather than conclusions of the declarant that "he shot me for nothing." Here it will be noted that the court directed witness to tell "all that he said," and the witness not only told all that was said, but much that was done.

Reference to the following cases will, we think, clearly demonstrate that the statements made by deceased both immediately following the shooting, and later at the hospital were admissible; the first as part

of the res gestæ, the latter as a dying declaration: In Engle v. Com., 258 Ky. 118, 79 S. W. (2d) 417, we held, "He was not doing anything," to be a "pure statement of fact." We said in the very nature of things the declarant may tell what he was doing or not doing at the time of the homicide, as held in cases cited. In the case of Nolan v. Com., 261 Ky. 384, 87 S. W. (2d) 946, we held that "I wasn't doing anything," coupled with the statement, "Boys I am killed. I didn't expect him to shoot me," was admissible. In Huff v. Com., 275 Ky. 578, 122 S. W. (2d) 143, we held that the court properly admitted as res gestæ, "Why did this man want to shoot me up, and me begging him."

In Lowe v. Com., 276 Ky. 251, 124 S. W. (2d) 60, a statement to the effect that "he had done nothing" to cause appellant to shoot him; that he came around the automobile and appellant met and shot him, was held admissible.

Having thoroughly considered the numerous grounds for reversal, we have been unable to find any one or more urged which would justify us in any conclusion other than that appellant received a fair trial.

Judgment affirmed.